Fuchsberg, J. (concurring).
I respectfully suggest that the opinion of the majority represents too summary a disposition of this case. Here by our permission, both sides to this appeal have raised, and extensively briefed and argued to us, significant issues involving the construction and application of the Uniform Commercial Code to the factual findings made at Trial Term. In this great center of modern commerce, more business transactions undoubtedly are affected by the code than anywhere else in the world. When, therefore, leading authorities note that our State’s nisi prius decisions in this area are in disarray (Duesenberg, Sales, Bulk Transfers and Documents of Title, 31 Business Lawyer 1533, 1543-1544), it seems to me that a fuller exposition of a legal rationale is very much in order.
I start by noting that the outcome of this appeal centers on whether the plaintiff, Kleinschmidt Division of SCM Corporation (hereinafter SCM), and the defendant, Futuronics Corporation (hereinafter Futuronics), entered into a binding agreement for the sale of 4,436 teletypewriters for a total price of over $4,700,000.
The action was originally brought by SCM for breach of contract and fraudulent inducement. Futuronics also counterclaimed for breach of contract as well as for a variety of torts associated with the execution of the transaction, including malicious breach of contract, unfair competition, interference with contractual relations, prima facie tort and conversion. The trial court in an "opinion-decision” after a nonjury trial found as a fact that the parties had reached agreement only with respect to 604 of the teletypewriters, these being the ones denominated during the course of the negotiations as "Lot I”, and, since it also found that the agreement as to that lot had been fully performed, it dismissed SCM’s complaint.
Upon the basis of the factual findings, the trial court also dismissed all of Futuronics’ counterclaims. Futuronics appealed to the Appellate Division from so much of the judgment entered on the Trial Judge’s decision as was adverse to *975 it; SCM did not appeal. The Appellate Division, in affirming, did so on the opinion at trial term. It is for the reasons which follow that I join in upholding its order.
Principles of law are not to be applied in the abstract. Therefore, though bearing in mind that we are bound by the now affirmed findings of the trial court (NY Const, art VI, § 3, subd a; Rudman v Cowles Communications, 30 NY2d 1, 10; Cohen and Karger, Powers of the New York Court of Appeals, §§ 109, 119), we nevertheless must proceed to search the record for the pertinent proof upon which they had to depend for their support.
SCM and Futuronics were manufactueres of teletypewriters. On three occasions between 1968 and 1970 each bid to supply teletypewriter requirements of the United States Department of Defense. Futuronics was the successful bidder on each occasion; the defense contracts provided for a total price of some $5,400,000. During the course of prior contractual relationships with the Government, SCM had accumulated a substantial stock of completed teletypewriters and parts. Out of a desire to make use of that inventory and keep its labor force going, in the fall of 1970 the then newly appointed president of SCM’s Kleinschmidt Division, Harry Gaples, informed Albert Blanck, the president of Futuronics, that it was interested in contracting to manufacture and sell to Futuronics the 4,436 teletypewriters needed to fill its three orders. That communication led to a meeting between Gaples and Blanck on October 6, 1970.
What transpired at that meeting was sharply disputed at trial. According to Blanck, there was a detailed discussion of the specifications of all the types of machines called for in Futuronics’ three contracts, following which the parties then and there agreed upon all the terms of a contract for their manufacture. On the other hand, Gaples, who had joined SCM only about a month earlier, testified that he was not sufficiently familiar with the specifications to discuss them at that time, so that, though he had agreed on the quantity and price per unit of the teletypewriters to be supplied, on the fact that they were to be packed "commercially” rather than "militarily” and that SCM would credit Futuronics with the book value of the latter’s work in progress "up to” $500,000, he had withheld any commitment on such patently vital matters, among others, as Futuronics’ demands for prompt initial deliveries and whether SCM would be willing to depart from *976 its insistence that it would undertake the manufacture of the machines only according to the specifications which it had followed in the past rather than as provided by Futuronics’ military contracts.
Both agreed that though, at the conclusion of their meeting, Blanck prepared, signed and handed Gaples its "purchase order No. 6791”, Gaples did not sign it at that time; nor does it appear that Blanck asked him to do so, despite the fact that the order form included a place for the seller’s signature. The quantity of each of the kinds of teletypewriters required for each of the three lots and a uniform unit price of $1,076 did appear on the purchase order. But, under the heading "notes”, it contained the following typewritten statement: "1. Delivery to be established by mutual agreement. 2. Payment schedule to be established by mutual agreement. 3. Specifications to be established. 4. Credit of $500,000 for work in progress, as is, to be given by Kleinschmidt to Futuronics Corporation.”
Mr. Justice Helman, the Trial Judge, apparently crediting Gaples’ version of the meeting over that of Blanck, rejected Futuronics’ contention that the unilaterally signed purchase order was a confirmation of an oral agreement. In view of the language of the purchase order, he noted that "It is difficult to understand how sophisticated business people dealing with each other for the first time, in a transaction involving more than $5,000,000, could regard this document as a contract binding on each when so many important matters were left open.” It is, of course, a basic rule of law that a contemplated contract will not have reached a legally enforceable stage while one or more of its material provisions is still in dispute (Willmott v Giarrupto, 5 NY2d 250, 253 [Fuld, J.]), a general principle which survives the Uniform Commercial Code (see, e.g., Uniform Commercial Code, § 1-103; Olympic Jr. v David Crystal, Inc., 463 F2d 1141; ABC Trading Co. v Westinghouse Elec. Supply Co., 382 F Supp 600, 603-604; Viacom Int. v Tandem Prods., 368 F Supp 1264; Campbell v WABC Touring Corp., 78 Misc 2d 671, 673).
For, under the Uniform Commercial Code itself, "[i]n spite of the validity of open terms permitting the other party to the transaction to specify various terms or aspects of performance, and of the liberal treatment given to new or additional terms in acceptance or confirmation, it is still necessary that there be an agreement of the parties, and when it is clear that they disagree as to material terms, there is, as under pre-Code *977 authority, no sale or contract to sell” (1 Anderson, Uniform Commercial Code [2d ed], § 2-204.9, p 316; see, also, White & Summers, Uniform Commercial Code, p 101).
To seek out the denouement of the parties’ negotiations, in the light of the finding that no agreement had been arrived at on October 6 it is then necessary to track the course of their ensuing conduct. Since no crucial role can be ascribed to SCM’s short telegram of October 9 in which it purported to do no more than advise Futuronics that it was prepared to ship a small quantity of teletypewriters to the Army for "testing”, the next item of significance, in chronological order, is a document entitled "Amendment #1 to Purchase Order No. 6791”. Consisting of a printed order form identical to the one Blanck used on October 6, it was sent to SCM by Futuronics on October 13, 1970.
"Amendment #1”, in contrast to the original purchase order, referred to the teletypewriters in terms of Lots I, II and III, each lot apparently corresponding to those embraced respectively by Futuronics’ 1968 Defense Contract and the two that followed in 1970. Under Lot II, "Attachment 1” had substituted 248 more expensive machines for a similar number of less expensive ones referred to as TT-985’s in the original purchase order; this change alone affected well over a quarter of a million dollars of merchandise. Amendment No. 1 also bore on its face the words, "This amendment established the terms and conditions of the subject purchase order as provided for in the basic document”; it contained too, as had the original purchase order, a request for a written acknowledgment of its terms and conditions. Attached to "Amendment #1” was a three-page, single-spaced document headed "attachment #1”, which detailed a host of terms and conditions regarding the manufacture and sale of the teletypewriters. In view of the affirmed factual findings with regard to the events of October 6, Purchase Order No. 6791 of that date and Amendment No. 1 of October 13 may, at most, be reasonably read together compositely as an offer from Futuronics as of the latter date and not as a later confirmation that there had been a meeting of the minds on October 6.
SCM responded on October 28, 1970. It did so by its return to Futuronics of acknowledgment copies of both Purchase Order No. 6791 and Amendment No. 1. However, on the line provided for its acknowledgment, on each one SCM stated that the terms and conditions of its acceptance were to be found in *978 an accompanying letter of transmittal. That letter, also dated October 28, contained no less than nine pages of terms and conditions differing in at least 10 substantive respects[1] from those set forth in Futuronics’ Amendment No. 1.
Understandably, the trial court found Futuronics’ insistence that SMC’s October 28 letter is to be treated as "an unconditional acceptance of Purchase Order No. 6791 and Amendment #1” completely unpersuasive since, on its face, it was almost a four-square rejection of the matters particularized in Amendment No. 1.
Appellant’s companion argument that SCM’s failure to object within 10 days to the terms and conditions contained in Amendment No. 1 constituted an acceptance under section 2-201 of the Uniform Commercial Code is no more meritorious. For that section is concerned with the enforceability, not the formation, of a contract and the sole consequence of a failure to object, in accordance with its subdivision (2), is to remove the Statute of Frauds as a defense (see, e.g., Rubin & Sons v Consolidated Pipe Co., 396 Pa 506; Cargill Inc. v Wilson, 166 Mont 346; see, also, 3 Duesenberg & King, Sales and Bulk Transfers Under the Uniform Commercial Code, § 2.204 [2] M).
Appellants further contend that, in the alternative, a statement in the October 28 letter that "we are pleased to accept your purchase order no. 6791 for various teletypewriter equipment” ■ constituted an acceptance. In doing so, however, it ignores the further language "[w]e request that the following conditions be made a part of this order”, which precedes the 10 particularizations to which we have already referred. Suffice it to say that, in the context of the negotiations up to that point, the trial court most certainly is not to be faulted as a matter of law for finding as a fact that the intent of the October 28 letter was that no contract would be effected *979 unless its conditions were met. And it is evident that untoward reliance on the softness and civility of the words "please” and "request” as a reason to regard the "conditions” as precatory rather than firm would not only run counter to the Uniform Commercial Code’s policy to give recognition to the reality of dealings between people in the commercial world but be a return to a "highly formalistic era” characterized by "magic phrases” (Murray, Intention Over Terms:- An Exploration of UCC 2-207 And New Section 60, Restatement of Contracts, 37 Fordham L Rev 317, 322; see, also, 3 Duesenberg & King, Sales and Bulk Transfers Under the Uniform Commercial Code, p 3-52).
In short, as of October 28, there was found to be a material and hardening divergence of positions between the parties. SCM’s was crystallized by its letter of that date; Futuronics’ was to be found in its two purchase orders.
Events that unfolded from that point on are headed by a letter dispatched by Futuronics on November 9 in response to SCM’s of October 28. It did not come close to narrowing the gap between the parties; a comparison of the exchanged correspondence shows that at least eight areas of disagreement were still open. These were: (1) whether there would be an increase in unit cost for military packaging for all of the lots, (2) which party would do the testing, (3) who was to obtain the necessary waivers for all of the lots, (4) whether there would be an increase in unit price for the two disputed models in Lot II, (5) what the payment schedule was to be, (6) whether there would be a 6% price increase in the event Futuronics exercised its option for more production, (7) methods of packaging, (8) who was to retain the test data.
Even after subsequent meetings in December, 1970 and January through March, 1971, the passage of time only served to underline continuing differences as to who was to assume the costs that SCM would incur if it performed the various items on which Futuronics had been insisting. Indeed, the trial court found that Futuronics would not order production on Lots II and III unless SCM would agree to Futuronics’ remaining conditions. SCM remained equally adamant in its refusal to do so. In order to meet the requirements of the 1968 Army contract,[2] the parties finally agreed upon a basis for *980 delivery of the 604 teletypewriters comprising Lot I, but they never came to terms as to Lots II and III. Things finally came to a head at a meeting on April 28, 1972, at which Gaples offered a settlement of SCM’s demands by a sharing of costs; Blanck rejected it on behalf of Futuronics. It is clear that on the basis of this prolonged history of the unsuccessful efforts to reach agreement, there is no predicate on which it may be concluded that the trial court’s factual determination that the parties’ minds never met on essential terms with respect to Lots II and III was impermissible as a matter of law. To the contrary, there is an absence of "conduct by both parties which recognizes the existence of * * * a contract” as prescribed by subdivision (1) of section 2-204 of the Uniform Commercial Code.
However, notwithstanding the intractable differences between the parties and their failure to come to an agreement, as found by the trier of the facts, appellant asserts that the conditions set forth in Futuronics’ letter of November 9 must be regarded, under subdivision (2) of section 2-207 of the Uniform Commercial Code, merely as "proposals for addition to the contract”, whose acceptance or rejection, or materiality or immateriality, would not prevent it from operating as an acceptance as a matter of law. The short answer to that contention is that section 2-207 of the Uniform Commercial Code does not come into play unless, as a threshold matter, an enforceable commercial understanding has in fact been arrived at. Specifically, section 2-207 has no application to the present case where there is a factual finding of failure to reach agreement. That failure terminated the power of acceptance and was not to be vitiated ipse dixit by the unilateral dispatch of a letter of "acceptance” containing the very conditions by which the other party had previously indicated it did not intend to be bound.
These principles apply, of course, with equal force to SCM’s letter of October 28. Neither the letter of October 28 nor that of November 9 involved the kind of circumstance to which section 2-207 is appplicable, i.e., either (1) "minor suggestions *981 or proposals such as 'ship by Tuesday’, 'rush’ * * * or the like”, or (2) more crucially, a situation in which "a deal has in fact been closed”. In the latter event, not the case here, a "deal” may survive the unsuccessful proffer of even material "proposals for addition to the contract” (Uniform Commercial Code, § 2-207; Official Comment 1, 2, McKinney’s Cons Laws of NY, Uniform Commercial Code, Book 62½, p 175).
As Duesenberg and King have so well put it, in language fully applicable here, "the concepts of mutual assent and intention to accept the terms of an offer are not jettisoned by the Code, and a variance of the type suggested is so great that, irrespective of the words used, there should not be held to have come into existence a binding [contract] * * * [for] only then should the presumptions of Section 2-207 as to additional terms become relevant. Basically, Section 2-204 controls as to when a contract is formed, and that section includes the requirement that the facts must 'show agreement’ ” (3 Duesenberg & King, Sales and Bulk Transfers Under the Uniform Commercial Code, § 3.03 [1] [a]; § 3.05; see, also, Duval & Co. v Malcom, 223 Ga 784; Euclid Eng. Co. v Illinois Power Co., 79 111 App 2d 145; Luis Hirsch y Cia. S. A. v Rosenblatt Casing Co., 418 F2d 1300; cf. Construction Aggregates Corp. v Hewitt-Robins, 404 F2d 505).
Turning next to the matter of the "work in progress”, it is undisputed that SCM took over the parts and materials which Futuronics had been assembling in contemplation of its own manufacture of the teletypewriters. As Purchase Order No. 6791 indicates, Futuronics was to receive a "credit of $500,-000” for these goods "as is”. Futuronics claimed the figure was a firm one; SCM claimed that it was but an "educated guess” which was to be adjusted on the basis of a subsequent determination of true book value. The record reveals that the trial developed a considerable amount of uncertainty as to value and an admission by Blanck that, if it had turned out that the estimate was erroneous, he would have regarded an adjustment as in order. It was agreed that the parties had been unable to arrive at such an adjustment on their own.
With all that before it, the trial court, apparently doing the best it could with evidence that was less than ideal for fact-finding purposes, found that the $500,000 figure was not intended to be immutable and that the actual value rested between $375,000 and $400,000; since SCM had allowed Futuronics a credit of $381,644.08 on Lot I, perhaps with just a *982 dash of King Solomon the Trial Judge then found that the credit represented full payment for the "work in progress” and dismissed both SCM’s claim for a refund of part of that credit as well as Futuronics’ counterclaim for conversion. The Appellate Division, with its power to act on the facts (CPLR 5501, subd [c]) and "in the interests of justice” (Rivera v W. & R. Serv. Sta., 34 AD2d 115, 117), having unanimously affirmed these essentially factual determinations, they too must be regarded as beyond our reach.
Finally, having considered both the evidentiary errors which appellant has raised as well as appellant’s contentions with regard to the sufficiency of the evidence to support the findings for the respondent on those of appellant’s counterclaims which sound in tort, we find each of them to be without merit.
Accordingly, the order of the Appellate Division must be affirmed.
Chief Judge Breitel and Judges Jasen, Gabrielli, Jones and Wachtler concur in memorandum; Judge Fuchsberg concurs in result in a separate opinion in which Judge Cooke concurs.
Order affirmed, etc.

. The 10 areas of disagreement consisted of (1) terms under which Futuronics would receive credit for its work in progress; (2) terms of payment; (3) the increased cost of supplying teletypewriter models UGC-4’s and- FGC-20X’s; (4) marking of parts; (5) painting of magnesium castings; (6) type of packing; (7) responsibility for testing the equipment; (8) responsibility for preparation of technical drawings; (9) responsibility for supplying gages and gage cases; (10) Futuronics’ options to increase the number of teletypewriters it might order and the price to be paid therefor. SCM’s Qctober 28 letter also contained additional terms relating to Futuronics’ responsibility to supply nameplates and manuals, provisioning documentation and other software, and payment to the Government for use of Government-owned tooling located at Kleinschmidt’s plant.

. As earlier noted, Lot I was first referred to by Futuronics in Amendment No. 1. Thereafter the parties continued to refer to the machines covered by the 1968 contract as Lot I, and the machines covered by the two 1970 contracts as Lots II and *980 III. Viewed in light of the surrounding circumstances, this clearly reflected the parties’ intent to treat Lot I as separate and distinct from Lots II and III (see Uniform Commercial Code, § 2-105, subd [5]; § 2-307; Rentaways, Inc. v O’Neill Milk & Cream Co., 308 NY 342, 348; Ripley v International Rys. of Cent. Amen, 8 NY2d 430, 437; 3A Corbin, Contracts, § 694; 6 Williston, Contracts [3d ed], § 862; Restatement, Contracts, § 351, subd [a]; § 487).