No. 12826

IN THE SUPREME COURT OF THE STATE OF MONTANA

1975

---

CARGILL INCORPORATED,
a corporation,

Plaintiff and Respondent,

-vs-

KENNETH L. WILSON,

Defendant and Appellant.

---

Appeal from:  District Court of the Twelfth Judicial District,
Honorable Bernard W. Thomas, Judge presiding.

Counsel of Record:

For Appellant:

Tipp and Hoven, Missoula, Montana
Vernon Hoven argued, Missoula, Montana

For Respondent:

Jardine, Stephenson, Blewett & Weaver, Great Falls,
Montana
L. Morris Ormseth argued, Great Falls, Montana

---

Submitted:  January 15, 1975

Decided: MAR 11 1975

Filed: MAR 11 1975

*Thomas J. Kearney*
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal from a judgment entered in the district court, Hill County, in a breach of contract action initiated by Cargill Incorporated against Kenneth Wilson, a Hill County wheat farmer. The jury held in favor of Cargill and damages were assessed at $21,011.50, including interest and costs.

Defendant Kenneth Wilson, hereinafter referred to as Wilson, is a Havre resident who operates a farm consisting of four sections of land near Rudyard, Montana. Plaintiff Cargill Incorporated, hereinafter referred to as Cargill, is a large, national grain company which maintains a grain elevator in Hingham, Montana. The Hingham elevator is managed by one Marcus "Ole" Warren. Warren purchased wheat from Wilson during the ten or twelve years prior to this lawsuit.

The events which gave rise to the instant litigation are: On the morning of August 24, 1972, Wilson telephoned Warren at the Hingham grain elevator to inquire about the current price of wheat. Warren quoted a price of $1.50 a bushel. Wilson declined to sell his wheat at that time.

However, during the afternoon of the same day Wilson again telephoned Warren and was informed the price of winter wheat had dropped four cents a bushel to $1.46. At this point there is a conflict in the testimony. Warren testified he and Wilson then entered into an oral contract over the telephone whereby Wilson was to sell 28,000 bushels of ordinary winter wheat at $1.48 a bushel and 6,000 bushels of higher protein wheat at $1.63 a bushel. On the other hand, Wilson admitted he had entered into an oral agreement but testified he had agreed to sell only 11,000 bushels of ordinary winter wheat at $1.48 a bushel.

Following the telephone call, Warren contacted Cargill's head office in Great Falls and notified it of the purchase. He also completed two standard grain purchase contracts, one numbered 86027 for the ordinary winter wheat; the other numbered 86028 for the

higher protein winter wheat. The contracts reflected the terms of the agreement as testified to by Warren. Warren signed the contracts as agent of Cargill and signed Wilson's name in the seller's signature block.

A few days later Warren delivered a copy of each contract to Wilson who noted the terms of the contracts and made no objection to them. He also made no objection to the fact that his name had been signed to the contracts by Warren.

On August 30, 1972, Wilson received an interest free advance of $10,000 from Cargill. Such an advance is a loan from a grain company secured by existing future delivery contracts for grain. This loan was interest free by custom but as an advance on the contract. Had it not been an advance it would not have been interest free. The advance was made by check connected to a detachable part of a standard form which identified the transaction and the purpose of the payment. The form identified the transaction as "Advance on 86027 and 86028". Wilson accepted the check with the form attached and made no objection that the form referred to the contracts as testified to by Warren.

During the months of September and October 1972, Wilson began hauling his wheat to the grain elevator; 11,000 bushels of ordinary winter wheat at the agreed price of $1.48 and 6,000 bushels at a higher current market price. However, in December, Warren discovered that Wilson did not intend to abide by the terms of the grain purchase contracts and deliver the balance of the wheat. A breach of contract action was initiated. A Hill County jury found Wilson liable under the oral agreement as testified to by Warren. Wilson asserted the defense of the statute of frauds at all times during this action.

Appellant Wilson presents several issues for review on appeal but we find the controlling issue is: Whether the oral agreement for the sale of the wheat, plus the exchange of several documents, was sufficient to remove the oral agreement from the statute of frauds?

We find in the affirmative.

Montana's statute of frauds, set forth in the Uniform Commercial Code, section 87A-2-201(1), R.C.M.1947, provides:

"Except as otherwise provided in this section a
contract for the sale of goods for the price of
$500 or more is not enforceable by way of action
or defense unless there is some writing sufficient
to indicate that a contract for sale has been made
between the parties and signed by the party against
whom enforcement is sought or by his authorized
agent or broker. A writing is not insufficient be-
cause it omits or incorrectly states a term agreed upon
but the contract is not enforceable under this para-
graph beyond the quantity of goods shown in such
writing."

The official comment to this section in the Uniform Commercial Code states this rule:

"Only three definite and invariable requirements as
to the memorandum are made by this subsection.
First, it must evidence a contract for the sale of
goods; second, it must be 'signed', a word which in-
cludes any authentication which identifies the party
to be charged; and third, it must specify a quantity."

Section 87A-2-201(2), R.C.M. 1947, sets forth this principle:

"Between merchants if within a reasonable time a writing
in confirmation of the contract and sufficient against
the sender is received and the party receiving it has
reason to know its contents, it satisfies the requirements
of subsection (1) against such party unless written notice
of objection to its contents is given within ten days
after it is received."

In Gravelin v. Porier, 77 Mont. 260, 281, 250 P. 823, this Court citing Pomeroy on Contracts, Specific Performance, Sec. 74, p. 104, said:

"'The controlling motive of the statute is one of
expediency and convenience, and this motive has always
been kept in view by the ablest courts in their work of
interpretation. As the primary object is to prevent
mistakes, frauds, and perjuries, by substituting written
for oral evidence in the most important classes of
contracts, the courts of equity have established the
principle, which they apply under various circumstances,
that it shall not be used as an instrument for the accom-
plishment of fraudulent purposes; designed to prevent
fraud, it shall not be permitted to work fraud.'"

In the world of business transactions, the injustices resulting from a literal, rigid application of the statute of frauds have caused courts, legislators and scholars to reshape and define the statute. Two of the qualifications developed are applicable to the instant case. One was developed by the legal scholars and enacted

- 4 -

by the legislature; the other was developed by the courts. The two qualifications have two things in common:

1) A recognition that the law should require some writing exchanged between the parties which sets forth their agreement; and

2) A requirement that the relationship and course of dealings between the parties justifies one party's belief that the other has consented to the written statement of the contract, even though he has not signed it.

When these conditions are found to exist, the contract may be enforced. The beneficial purposes of the statute of frauds are preserved---the dangers of mistake or fraud are averted--- and the ends of justice are served.

Under section 87A-2-201, R.C.M. 1947, the question of whether or not Wilson is a merchant within the meaning of the statute, will not be considered here for it is obvious that other requirements of the statute are met. Evidence of confirmation of the two contracts is:

1) They were given Wilson "within a reasonable time", a few days following the oral agreement and on the next time Wilson visited the elevator.

2) The agreements were "sufficient against the sender" in that they were complete as to all details and signed by Warren on behalf of Cargill.

3) They were received by one "who had reason to know its contents" --- Wilson admitted the prior oral agreement and that he had read the contents of the contracts when he received them.

4) He did not object "within ten days" after receipt of the contracts, nor even within four months.

We find the requirement of a signed writing was met with the interchange of the documents between the parties. The general law on the subject is set forth in Restatement of Contracts § 208:

"§ 208. WHEN SEVERAL WRITINGS CONSTITUTE A SUFFICIENT MEMORANDUM.

"The memorandum may consist of several writings, * * *

"(b) though one writing only is signed if

"(i)   the signed writing is physically annexed to the other writing by the party to be charged, or

"(ii)   the signed writing refers to the unsigned writing, or

"(iii) it appears from examination of all the writings that the signed writing was signed with reference to the unsigned writings."

Here, Wilson admits he was handed contracts numbered 86027 and 86028 and that he did not then nor later object to their contents. Within a few days thereafter, he asked for and received an advance payment of $10,000. The memorandum given to him, to which the $10,000 check was attached, incorporated the earlier contracts by referring specifically to their numbers. The numbered contracts did contain all of the essential elements of a contract; the later memorandum incorporated these documents by specific reference to their numbers. Wilson accepted this memorandum, again without any objection as to its contents, and he took the further step of signing his name to the check which was attached. When he did this, he either signed a sufficient memorandum of an earlier oral contract, or he accepted an offer which had been made by Cargill when its agent handed him the written numbered contracts.

Research does not disclose any cases similar to the instant one, however, we direct attention to Leach v. Crucible Center Company, (1st Cir. 1968), 388 F.2d 176, where the circuit court of appeals found that a check and a receipt for the check which were exhanged on August 4, 1965, and each of which described the property and the agreed sales price, fixed the date of a binding transaction as August 4, even though a detailed sales agreement and a signed statement that an offer had been accepted were not submitted to the purchaser until a day later.

Higby v. Hooper, 124 Mont. 331, 221 P.2d 1043, although not closely in point, is a case where a party was bound to the terms of a previous oral contract for building a house by his signature on a letter to a lending agency which referred to plans and specifications set forth on other pieces of paper. Johnson v. Elliot, 123 Mont. 597, 218 P.2d 703; Johnson v. Ogle, 120 Mont. 176, 181 P.2d 789; Gantt v. Harper, 86 Mont. 69, 281 P. 915.

The Uniform Commercial Code, sections 87A-2-204, 87A-2-205 and 87A-2-206, R.C.M. 1947, read:

> "87A-2-204. Formation in general. (1) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.
>
> "(2) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.
>
> "(3) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy."
>
> "87A-2-205. Firm offers. An offer by a merchant to buy or sell goods in a signed writing which by its terms gives assurance that it will be held open is not revocable, for lack of consideration, during the time stated or if no time is stated for a reasonable time, but in no event may such period of irrevocability exceed three months; but any such term of assurance on a form supplied by the offeree must be spearately signed by the offeror."
>
> "87A-2-206. Offer and acceptance in formation of contract. (1) Unless otherwise unambiguously indicated by the language or circumstances
>
> > "(a) an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances * * *."

Section 87A-2-204(2) is directed primarily to the situation where the interchanged correspondence does not disclose the exact point at which the deal was closed, but the actions of the parties indicate that a binding obligation has been undertaken. Under section 87A-2-205, the signed copy of the contract that Warren gave Wilson was at least binding upon Cargill as an offer, and Wilson's subsequent conduct with respect thereto may be found to be an acceptance within the meaning of section 87A-2-206, R.C.M. 1947.

The problem is thoroughly considered in 3 Bender's Uniform Commercial Code Service, § 2.04(2), pp. 2-51 through 2-55:

"A more troublesome problem in ascertaining the form required of a writing for it to meet the test of a memorandum arises in connection with separate pieces of paper, none of which alone is sufficient, but all of which, when taken together, would qualify. What is required to incorporate past writings? What is necessary to permit a reading together of several writings to establish the existence of single memorandum?

"This problem was clearly presented in a well-known case in which a printed form containing all the essential terms of the bargain had been completed, except for the signature of either party. About six months later, the defendant-buyer wrote to the seller, asking him to 'please cancel my order,' and signed the letter. The court stated the rule of incorporation in its classic form:

"'In order to satisfy the requirements of [the statute], the note or memorandum may consist of several writings, though the writing containing the requisite terms is unsigned, if it appears from an examination of all the writings that the writing which is signed by the party to be charged was signed with the intention that it refer to the <u>unsigned writing,</u> and that the writings are so connected by internal reference in the signed memorandum to the unsigned one, that they may be said to constitute one paper relating to the contract.'

"As applied to the case, this statement of the rule was not necessarily dispositive of the issue. The later writing contained a reference to an order, but the order to which it referred was not specifically identified. Obviously, an identification, as by number, would make application of the rule relatively easy. But the word 'order' of itself could refer to the prior writing constituting a purchase order, or it could refer to another oral communication. It is not essential that the signed writing intentionally refer to the prior unsigned writing which contains the essential terms of the contract, but it is essential that the reference be internal to the writing which is signed. The reference must be to the writing, and not necessarily to the same transaction. In disposing of the case, the court said:

"'If the signed memorandum makes no reference to the unsigned memorandum, they may not be read together. Parol evidence is inadmissible to connect them * * *. Here, we have nothing to indicate that the postal card refers to an extrinsic writing. It does not identify the unsigned written memorandum * * * nor does it identify any of its terms * * *. To conclude otherwise would be to subvert the spirit of the statute.'

"This is the generally accepted view, though admittedly it is a fine distinction between a reference which is to the same transaction and one which is to another paper. The reference to the other paper must be contained in the signed writing, whereas that the transaction to which several writings refer is the same transaction is a matter which may be shown by parol evidence. Though parol evidence is not admissible to supply the reference, it is admissible to

- 8 -

construe words for purposes of establishing the internal incorporation by the signed writing. The internal evidence of a common subject matter may be sufficient to make the connection. Because of the subjectivity of the rules in this area, it is not surprising that the cases from jurisdiction to jurisdiction are not in complete accord, and the Code makes no attempt to settle the uncertainty. In view of the widespread disposition that the statute is not always used to prevent fraud, but may be an instrument of its perpetration, the admonition of Judge Cardozo that the staute should not be pressed to the extreme of a literal and rigid logic, should be kept in mind.

"In several of the cases just referred to, the writings were negative in character; they were attempted cancellations, rather than positive memoranda of an existing contract. That such documents may satisfy the statute is not in question, for it is not the intention of the document that is important, but rather its internal evidencing of a contract. Thus, a negative writing alone, or coupled with a prior unsigned writing, may constitute a sufficient memorandum." (Emphasis supplied.)

The judgment of the district court is affirmed.

_____
                    Justice

We Concur:

-------------------------------------
    Chief Justice

_____

-------------------------------------

-------------------------------------
    Justices.

Mr. Justice Frank I. Haswell:

    I concur in the result.

_____
                    Justice

- 9 -