No. 83-107

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

_____

NORTHWEST POTATO SALES, INC.,

Plaintiff and Appellant,

-vs-

CHARLES BECK,

Defendant and Respondent.

_____

APPEAL FROM: District Court of the Third Judicial District,
In and for the County of Powell,
The Honorable Robert J. Boyd, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Patrick F. Hooks, Townsend, Montana

For Respondent:

James J. Masar, Deer Lodge, Montana

_____

Submitted on Briefs: June 30, 1983

Decided: March 2, 1984

Filed: MAR 2 - 1984

*Ethel M. Harrison*

_____
Clerk

Mr. Justice Daniel J. Shea delivered the Opinion of the Court.

Plaintiff, Northwest Potato Sales, Inc., a family corporation owned by the Martin McCullough family, and dealing primarily in the buying and selling of potatoes, appeals an order of the Powell County District Court dismissing its claim against the defendant, Charles Beck, for damages claimed as a result of an alleged failure by Beck to honor a contract to sell seed potatoes to Northwest Potato Sales. The trial court held that the alleged agreement was barred by the statute of frauds because Beck, although he had received the written contract containing the necessary terms, had not signed it. Although McCullough raised estoppel as a bar to Beck's reliance on the statute of frauds, and presented evidence on this issue, the trial court, in a memorandum opinion accompanying its findings and conclusions, but with no analysis of the evidence, and no attempt to apply the elements of estoppel to that evidence, held that the plaintiff failed to establish the requisite elements of estoppel. We reverse and hold that McCullough proved estoppel as a matter of law.

The trial presented essentially three issues. First, whether there was an agreement between McCullough and Beck. On this issue, the trial court failed to make any findings and conclusions, but in a separate memorandum opinion the trial court did conclude that the parties had not reached agreement. Second, whether Beck was entitled to rely on the statute of frauds as a defense because he had not signed the written contract. To decide this issue, the trial court first had to decide whether Beck was a "merchant" within the meaning of an exception to the statute of frauds as a

defense. Third, whether Beck was estopped by his active and passive conduct from reliance on the statute of frauds as a defense. The findings and conclusions did not mention the estoppel issue, but the court concluded in a separate memorandum opinion that the plaintiff failed to establish the requisite elements of estoppel. In reaching this conclusion, however, the trial court failed to analyze this evidence by application of the elements of estoppel.

It is within this trial context that the issues are raised on appeal. First, McCullough asks this Court to imply a trial court finding that an agreement did exist, because the trial court could not have decided the statute of frauds issue unless it first found an agreement to exist. Second, McCullough argues the trial court applied an improper legal standard in concluding that Beck was not a "merchant." In reaching its conclusion the trial court stated: "Each of the farmer-growers and the one banker-rancher all agree that the farmer did not have the knowledge or skill in the market place as that of a buyer-broker." McCullough argues this is an improper legal standard by which to judge the status of both parties. While he concedes he is a "merchant", he argues that the test is not one of comparing the skills and knowledge of the parties, and that the parties need not have substantially similar skills before a conclusion is justified that both parties are "merchants" so that an exception to the statute of frauds is triggered. However, because we conclude that McCullough proved estoppel as a matter of law, we need not decide the implied findings issue and we need not remand the case to the trial court to make findings on the "merchant" issue based on a proper application of the law.

- 3 -

The third, and dispositive issue, is whether McCullough proved the elements of estoppel. Beck argued at trial and now in his appeal brief that estoppel does not apply to the UCC statute of frauds. McCullough presented evidence on the existence of the contract and on Beck's active and passive conduct after he received the contract. This evidence was virtually uncontradicted and is sufficient to estop Beck from successfully invoking the statute of frauds. The trial court did not properly reach the estoppel issue. The separate findings and conclusions are silent on the estoppel issue. And although an attempt was made in the accompanying memorandum to dispose of the estoppel issue, the trial court failed to analyze the estoppel evidence that McCullough had presented, and failed to apply the elements of estoppel to this evidence. We are left with the unsupported conclusion of the trial court that "[t]he plaintiff has failed to establish the requisite elements of estoppel."

We set forth sufficient facts here to provide a general background picture and we then add more facts while applying the estoppel elements to the evidence.

On July 17, 1980, Martin McCullough, pursuant to a general custom with other Montana farmers and also pursuant to a custom established with Beck in three previous dealings, sent Beck a written contract confirming what McCullough believed was an oral telephone agreement for Beck to sell to McCullough 10,000 pounds of certified seed potatotes at $4.50 per cwt (cwt being the price per 100 pounds of potatoes). McCullough farms seed potatoes with his son in Broadwater County Montana, but his primary business is that of a licensed potato broker with some 20 years experience. McCullough operates his business, a family corporation

- 4 -

consisting of himself, his wife, and a son, out of Kennewick, Washington. Charles Beck is a farmer rancher in Powell County, who grows other crops and raises livestock, but who also had almost 15 years experience as a seed potato farmer. He was familiar with the marketing of seed potatoes, although he did not have the overall general experience of Martin McCullough. McCullough and Beck had been neighbors in times past, and McCullough had for several years leased 700 acres from Beck on which he grew seed potatoes. Their dealings had always been above board and each characterized the other as an honest person.

The written contract sent to Beck was in compliance with the UCC statute of frauds, and was sufficient to bind McCullough. By the time McCullough had sent the contract to Beck, McCullough had already made commitments to Washington "table-stock" farmers to purchase 10,000 pounds of Beck potatoes for use in the following spring planting season. Beck testified that he was fully aware of McCullough's practice in obtaining commitments from Washington "table-stock" farmers, and that he assumed McCullough had followed that practice in this instance.

Although Beck did not sign the contract (he testified at trial that he threw the contract away), he did nothing between July 17 and late November to tell McCullough they did not have an agreement. McCullough was not particularly worried about Beck not returning the signed contract because he testified that Beck was habitually slow in getting his paperwork done. During the period from July 17th to the end of November, McCullough acted in reliance on what he perceived to be Beck's promise, and during this same period Beck

actively and passively led McCullough to believe the contract would be honored.

The market price for seed potatoes rose steadily from July to November, and at the end of November, when the market price was approximately $9.00 per cwt (or twice that of the terms stated in the July 17th contract), Beck informed McCullough for the first time that they did not have a contract. He told McCullough that he had never agreed to the terms and that in any event he had not signed the contract. Because McCullough had committed 10,000 cwt of Beck's seed potatoes to Washington "table-stock" farmers, McCullough was forced to borrow an additional $45,000 at interest to obtain the cash sufficient to buy seed potatoes at the higher market price of approximately $9.00 per cwt. Beck also took action with respect to his seed potato crop. Although he insisted that he was not bound by the July 17th contract because he had not signed it, Beck nonetheless sold his 1980 seed potato crop on three verbal contracts -- he did not require written, signed contracts for any of those transactions.

This Court has never held that the absence of a signature to a contract otherwise binding is absolutely fatal to a contract for the sale of personal property. We recognized this principle most recently in Cargill Inc. v. Wilson (1975), 166 Mont. 346, 532 P.2d 988, where the defense was that the seller had not agreed to the contract because he had not signed the contract, even though his name had been signed to the contract by the grain dealer, with the seller's acquiescence. Although we recognized that the requirement of some writing is important to evidence the agreement, we held strict adherence to the signature requirement is not necessary where the "relationship and course of dealings

- 6 -

between the parties justifies one party's belief that the other has consented to the written statement of contract, even though he had not signed it." 532 P.2d at 990. If the necessary relationship and course of dealings is established, we held that:

> ". . . the contract may be enforced. The beneficial purposes of the statute of frauds are preserved - the dangers of mistake or fraud are averted -- and the ends of justice are served." Cargill, supra, 532 P.2d at 990.

Although the facts of Cargill are not directly analogous to the factual situation here, the case clearly recognizes that lack of a signature to a contract for the sale of goods is not indispensable to the enforcement of a contract otherwise binding. And that is the situation here. But here we rely on the principles of estoppel in holding that Beck cannot be permitted to rely on the statute of frauds where his active and passive conduct in the transaction led McCullough to detrimentally rely on the belief that he had a contract.

Although Beck cites authority holding that estoppel cannot apply to a UCC statute of frauds transaction, we have no difficulty in holding to the contrary. The UCC expressly mentions estoppel as one of the general principles of law that supplement the UCC (section 30-1-103, MCA), unless other parts of the UCC expressly displace that principle. Here no provision of the UCC states that estoppel cannot be applied to defeat a statute of frauds defense. Furthermore, another UCC provision, section 30-1-203, MCA, requires good faith in all UCC transactions, stating: "Every contract or duty within the [Uniform Commercial Code] imposes as obligation of good faith in its performance or enforcement."

Relying on this good faith provision, the Oregon Court of Appeals in Potter v. Hatter Farms, Inc. (Ore. 1982), 641 P.2d 628, in a factual situation much like the situation here, held that estoppel as a bar to enforcement of the statute of frauds, is consistent with the obligation of good faith required in all UCC transaction. And other cases with factual patterns similar to this case have recognized estoppel as a principle to defeat reliance on the statute of frauds as a defense to a contract suit. See Warder and Lee Elevator v. Britten (Iowa 1979), 274 N.W.2d 339; Decatur Cooperative Association v. Urban (Ks. 1976), 547 P.2d 323; Farmers Elevator Company of Elk Point v. Lyle (S.D. 1976), 238 N.W.2d 290. And, although the case did not involve a statute of frauds issue, this Court applied estoppel to UCC banking procedures in Beyer v. First National Bank of Dillon (1980), ____ Mont. ____, 612 P.2d 1285. Clearly, in the absence of a provision expressly prohibiting application of estoppel to particular provisions of the UCC, estoppel applies to UCC transactions.

This Court has recognized equitable estoppel, promissory estoppel, and estoppel by silence. Sweet v. Colburn School Supply (1982), 196 Mont. 367, 639 P.2d 521 (equitable estoppel); Keil v. Glacier Park, Inc. (1980), ____ Mont. ____ 614 P.2d 502 (promissory estoppel); City of Billings v. Pierce Packing Company (1945), 117 Mont. 255, 161 P.2d 636. McCullough argues that he is entitled to relief by application of any one of these principles of estoppel, and he has set forth in detail the evidence to support that conclusion. Beck, on the other hand, presented no evidence to refute McCullough's evidence, and Beck's appellate brief ignores the evidence marshalled by McCullough to support an

estoppel application. Beck simply argues that estoppel does not apply to a UCC statute of frauds transaction, a contention that we decide to the contrary.

Although we base our decision on estoppel by silence, we cannot deny that the facts may fit elements of estoppel also appropriate to equitable estoppel. This is so, because as is so often the case in any branch of the law, each form of estoppel does not fall into a neatly packaged and exclusive category. Rather, the forms of estoppel also blend with each other. For example, here there was not only a duty to speak imposed on Beck because of his relationship to McCullough and his knowledge that McCullough was relying on a belief that a contract existed, there was also active conduct by Beck that can only be interpreted as constituting an intent to mislead McCullough into thinking that Beck would honor the July 17th contract.

This Court set out the rule of estoppel by silence in Sherlock v. Greaves (1938), 106 Mont. 206, 76 P.2d 87, where we stated:

> "To constitute an estoppel by silence or acquiescence, it must appear that the party to be estopped was bound in equity and good conscience to speak, and that the party claiming estoppel relied upon the acquiescence and was misled thereby to change his position to his prejudice. [citing authority] Mere silence cannot work an estoppel. To be effective for this purpose, the person to be estopped must have had an intent to mislead or a willingness that another would be deceived; and the other must have been misled by the silence." Sherlock v. Greaves, supra, 106 Mont. at 217, 76 P.2d at 91.

The general situation is that Beck and McCullough knew each other well for many years, they had many dealings with each other over the years, and they had three previous potato seed sales where the same procedure was followed. Based on

- 9 -

past experience, Beck knew that McCullough had most probably committed the 10,000 cwt of Beck potatoes to Washington "table-stock" farmers, and Beck testified that he assumed such was the case in this transaction. Beck further testified that from July 17, 1980, until the end of November, 1980, McCullough at all times believed that he had a contract with Beck. And yet if Beck did subjectively believe that he had no contract with McCullough, he admitted he did nothing to inform McCullough of his position until the end of November. If Beck believed he had no contract with McCullough, he was clearly bound in equity and good conscience to tell McCullough at his earliest opportunity that he believed he had no contract. But Beck was silent.

However, the situation that existed after Beck received the July 17th contract in the mail, involves more than mere silence. Between July 17th and the end of November, McCullough testified that both Beck and Beck's wife told him on more than one occasion that the contract would be signed and sent to McCullough. Although Mrs. Beck denied the substance of these conversations with McCullough by stating that she could not recall the details of the calls, McCullough's testimony about his conversations with Charles Beck stands unrefuted. Further, on two occasions Beck told McCullough that his banker was concerned that he had not made a good deal but that he (Beck) was unconcerned because he was running the operation, not the banker. One of these occasions was in October when McCullough stopped at the Beck place on his way from Townsend, Montana to the state of Washington. This testimony also stand unrefuted. And finally, McCullough testified to a visit to the Beck place in August to check on the potato crops. Although Charles Beck

was not there (he was in Dillon according to the farm hand who spoke to McCullough), and Mrs. McCullough testified that she could not recall whether McCullough visited the farm in August, McCullough's testimony about his visit and the details of his visit cannot be ignored. Clearly, he would not have visited the Beck place to check on the progress of the seed potato crop unless he thought he had a contract with Beck. All of this is clear evidence that Beck, by his active as well as passive conduct, led McCullough to believe that he had a contract with Beck.

The uncontradicted evidence is that McCullough clearly relied to his detriment on the belief, fostered by Beck's active and passive conduct, that he had a contract with Beck. It was not until the end of November, when the market price for seed potatoes was up to $9.00 per cwt, that Beck first told McCullough that a misunderstanding had occurred, that he had never agreed to the contract, and that in any event he had not signed the contract. When McCullough learned of Beck's decision, in order to cover his commitment to Washington "table-stock" farmers for 10,000 cwt of Beck's seed potato crop, McCullough was forced to borrow an additional $45,000 at interest to purchase the potato seeds at the existing higher market price of $9.00 per cwt.

Finally, although Beck now makes an issue of not having signed the July 17th contract, he did not hesitate in selling his 1980 seed potato crops to others on the basis of unwritten, unsigned contracts. The only difference was that Beck sold his crops for the then existing market price of approximately $9.00 per cwt rather than the $4.50 per cwt he would have obtained had he honored the July 17th contract with McCullough.

- 11 -

These facts establish an estoppel by silence as a matter of law.

We reverse the judgment of the District Court and remand for consideration of the proper damages owed to McCullough.

_____
Justice

We Concur:

_____

_____

_____

_____
Justices