DA 11-0678

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2012 MT 213

JOHN DUNCAN TURNER, CHRISTINA TURNER
and SANDY COUCH,

    Plaintiffs and Appellants,

    v.

WELLS FARGO BANK, N.A.,

    Defendant and Appellee.

| | |
|---|---|
| APPEAL FROM: | District Court of the Thirteenth Judicial District,<br>In and For the County of Yellowstone, Cause No. DV 10-1343<br>Honorable Ingrid G. Gustafson, Presiding Judge |

COUNSEL OF RECORD:

    For Appellants:

        John R. Christensen, Timothy A. Filz; Christensen Fulton & Filz, PLLC;
        Billings, Montana

    For Appellee:

        Thomas E. Smith, Emily Jones; Moulton Bellingham PC;
        Billings, Montana

Submitted on Briefs:  July 11, 2012

Decided:  September 25, 2012

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Appellants John Duncan Turner, Christina Turner, and Sandy Couch ("the John Turners") appeal an order of the Thirteenth Judicial District Court, Yellowstone County, denying their motion for summary judgment and granting summary judgment in favor of Appellee Wells Fargo Bank, N.A. ("Wells Fargo"). We affirm.

¶2 We address the following issues on appeal:

¶3 1. *Whether the District Court correctly concluded that Wells Fargo was not contractually obligated to release the Deed of Trust the bank holds on real property owned by the John Turners.*

¶4 2. *Whether the District Court correctly concluded that the doctrines of promissory estoppel and equitable estoppel do not require Wells Fargo to release the Deed of Trust.*

## PROCEDURAL AND FACTUAL BACKGROUND

¶5 In 1977, James Duncan Turner and his wife Suzanne K. Turner built a home located at 6543 Frey Road in Shepherd, Montana ("the Shepherd property"). James later divorced Suzanne and the Shepherd property was titled solely in his name. On April 30, 2005, James married Julie A. Viers, and Julie's home in Montana City served as the couple's principal residence. That fall, James and Julie decided to "upgrade" and then sell the Shepherd property.

¶6 To finance the upgrade, James and Julie opened a line of credit with Wells Fargo. On December 13, 2005, they signed an agreement to use a financial product called a SmartFit Home Equity Account ("credit line agreement"). James alleges that they met with Wells Fargo agent Deborah Brown, with whom Julie was friends, and informed her that the credit line agreement would serve as a "bridge loan" until he sold the Shepherd

2

property. That same day, James and Julie granted Wells Fargo a Deed of Trust as security for the line of credit, which Wells Fargo recorded on January 23, 2006. Wells Fargo then loaned James and Julie $169,540—the maximum allowed under the credit line agreement—on January 26, 2006.

¶7 On August 4, 2006, the John Turners allegedly purchased the Shepherd property by depositing $322,000 into James and Julie's shared bank account. Later that day, James and Julie met with Deborah Brown, informed her that the Shepherd property had been sold, and requested that the sale proceeds be used to pay off their outstanding balance under the credit line agreement. Wells Fargo debited the outstanding balance from James and Julie's shared bank account and Deborah Brown wrote that the charges reflected a "mortgage payoff." For summary judgment purposes, the District Court assumed that James and Julie paid off the entire outstanding balance.

¶8 On September 11, 2006, unbeknownst to James or the John Turners, Wells Fargo advanced Julie, pursuant to her request, another $120,000 under the credit line agreement secured by the Shepherd property. James and Julie formally conveyed title to the Shepherd property to the John Turners by executing a quitclaim deed on October 11, 2006, which the John Turners recorded two days later. On November 21, 2006, Julie requested an additional sum of $42,459 under the credit line agreement and Wells Fargo granted that request. Including other lesser loans that Wells Fargo made, Julie borrowed a total of $169,090.65 under the credit line agreement secured by the Shepherd property after she and James had paid off the balance of that account using the proceeds from the sale of the property to the John Turners.

3

¶9    James did not discover that Wells Fargo still held a Deed of Trust on the Shepherd property until he completed a lien search as part of his bankruptcy proceedings in December 2008. James and John Turner met with Wells Fargo banker Brian Kimble on July 19, 2009, to discuss the Deed of Trust. Kimble initially informed James and John that, in his opinion, Wells Fargo should have closed James and Julie's account when they paid its balance down to zero. Wells Fargo, however, refused to release the Deed of Trust. The John Turners filed a complaint to quiet title to the Shepherd property on August 3, 2010. James and Julie are now divorced and, according to the terms of their divorce settlement, Julie is responsible for the debt she incurred under the credit line agreement.

¶10   On October 11, 2011, the District Court denied the John Turners' motion for summary judgment and granted Wells Fargo's motion for summary judgment. The court concluded that the John Turners could not enforce the terms of the credit line agreement because they were not intended beneficiaries of the agreement. The court concluded further that the John Turners had failed to establish a *prima facie* case for either promissory or equitable estoppel. The John Turners appeal.

## STANDARD OF REVIEW

¶11   We review a district court's ruling on motions for summary judgment de novo, applying the same M. R. Civ. P. 56(c) criteria as the district court. *Ternes v. State Farm Fire & Cas. Co.*, 2011 MT 156, ¶ 18, 361 Mont. 129, 257 P.3d 352. Summary judgment is appropriate only when the moving party demonstrates both the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Parish v. Morris*,

4

2012 MT 116, ¶ 10, 365 Mont. 171, 278 P.3d 1015. A district court's conclusion that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law is a legal conclusion we review for correctness. *Parish*, ¶ 10.

**DISCUSSION**

¶12 1. *Whether the District Court correctly concluded that Wells Fargo was not contractually obligated to release the Deed of Trust the bank holds on real property owned by the John Turners.*

¶13 The John Turners contend on appeal that the terms of the credit line agreement establish that Wells Fargo has a "direct contractual obligation . . . to release the Deed of Trust" and that the John Turners can enforce that obligation as third-party beneficiaries. The John Turners argue that there are "no provisions in the [Deed of Trust] stating how to go about obtaining a release" of the lien on the Shepherd property. In the "face of a clear lack of clarity or specific instructions in the Wells Fargo drafted documents pertaining to the procedure to get the Deed of Trust released," the John Turners argue that when James and Julie "d[id] it the old-fashioned way" and made an in-person, oral request to have their outstanding balance paid off, Wells Fargo became contractually bound to release the Deed of Trust.

¶14 Wells Fargo counters by asserting that James and Julie failed to terminate the credit line agreement in accordance with the specific procedures outlined in the agreement and, alternatively, that the John Turners lack standing to enforce the credit line agreement. Wells Fargo points out that Section 29 of the Deed of Trust provides that "[a]lthough the Secured Debt may be reduced to a zero balance, this Security Instrument will remain in effect until released." It therefore argues that an oral request that the

5

outstanding balance be paid down to zero was not sufficient to secure the Deed of Trust's release. Wells Fargo instead argues that, under Section 18 of the credit line agreement, James and Julie were required to send a signed letter to the Bank requesting that their account be closed and that neither did so.

¶15 We conclude that, even if a colorable claim exists that Wells Fargo was contractually obligated to release the Deed of Trust, the John Turners are not the ones to make such a claim since they had no contractual relationship with Wells Fargo. A stranger to a contract "lacks standing to sue for breach of that contract unless he is an intended third-party beneficiary of the contract." *Kurtzenacker v. Davis Surveying, Inc.*, 2012 MT 105, ¶ 20, 365 Mont. 71, 278 P.3d 1002 (citing *Dick Anderson Constr., Inc. v. Monroe Constr. Co., LLC*, 2009 MT 416, ¶ 46, 353 Mont. 534, 221 P.3d 675). If anyone was wronged by Wells Fargo's handling of this matter, it was James Turner, the Bank's client, who is not a party to the case. We agree with Wells Fargo that the John Turners lack standing to enforce the contract.

¶16 The John Turners admit that they were not parties to the credit line agreement when it was signed. They maintain instead that they became third-party beneficiaries of the original contract when James and Julie paid the outstanding balance on the credit line agreement and Wells Fargo debited James and Julie's shared bank account for "mortgage pay off" purposes. As Wells Fargo points out, that argument does not accurately reflect our jurisprudence on third-party beneficiaries. We emphasized in *Dick Anderson* that a person must be an *intended* beneficiary in order to seek enforcement of a contract to

which it is not a party. *Dick Anderson Constr., Inc.*, ¶ 46 (quoting *Palmer v. Bahm*, 2006 MT 29, ¶ 13, 331 Mont. 105, 128 P.3d 1031).

¶17    This Court, relying upon the *Restatement (Second) of Contracts* § 302 (1981), has described an intended third-party beneficiary as follows:

> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
>
> (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
>
> (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

*Diaz v. Blue Cross & Blue Shield*, 2011 MT 322, ¶ 18, 363 Mont. 151, 267 P.3d 756 (quoting *Restatement (Second) of Contracts* § 302(1)(a)-(b)).

¶18    "There is a plain distinction between a promise, the performance of which may benefit a third party, and a promise made expressly for the benefit of a third party." *Diaz*, ¶ 19. A plaintiff cannot merely assume that he is an intended third-party beneficiary to a contract; rather, "he must show from the face of the contract that it was intended to benefit him." *Kurtzenacker*, ¶ 20 (citing *Klingman v. Mont. Pub. Serv. Commn.*, 2012 MT 32, ¶ 40, 364 Mont. 128, 272 P.3d 71). We held in *Kurtzenacker* that a purchaser of property was not an intended third-party beneficiary of her predecessor's survey contracts even though the surveys were done in contemplation of future sales. Rather, at most, the future purchasers were "incidental beneficiaries" of the survey contracts, a status insufficient to give them standing to seek the contracts' enforcement. *Kurtzenacker*, ¶ 22.

7

¶19    The John Turners allege that they have satisfied the requirements for an intended beneficiary because "James Turner intended to give the John Turners the benefit of the promised performance," which allegedly occurred when James and Julie paid the outstanding balance on their credit line agreement. They claim that "as the purchasers and the ones providing the pay off funds," the John Turners were third-party beneficiaries of the agreement. Their argument overlooks the first prong of § 302 of the *Restatement (Second) of Contracts*, which provides in part that a third-party beneficiary designation is recognized only when "appropriate to effectuate the intention of the parties." That concept is reflected in the holdings of *Kurtzenacker* and *Klingman*, cited above. Because the John Turners do not, and in fact cannot, show from the face of the credit line agreement entered into by Wells Fargo and James and Julie that the contract was intended to benefit them, we hold that they are not third-party beneficiaries and they therefore lack standing to enforce James and Julie's contract with the Bank.

¶20    2.    *Whether the District Court correctly concluded that the doctrines of promissory estoppel and equitable estoppel do not require Wells Fargo to release the Deed of Trust.*

¶21    As a preliminary matter, the John Turners invite us to reject the distinctions between promissory and equitable estoppel and merge those doctrines by adopting what they characterize as the "modern rule with regard to estoppel"—the *Restatement (Second) of Contracts* § 90. Comment a of § 90 provides that this section "is often referred to in terms of 'promissory estoppel.'" *Restatement (Second) of Contracts* § 90 cmt. a (1981).

¶22    This Court has recognized at least three legally distinct estoppel claims—equitable estoppel, promissory estoppel, and estoppel by silence—even as we have recognized that

8

"the lines separating all three kinds of estoppel are blurry at best." *C B & F Dev. Corp. v. Culbertson State Bank*, 256 Mont. 1, 7, 844 P.2d 85, 89 (1992) (citing *Northwest Potato Sales, Inc. v. Beck*, 208 Mont. 310, 316-17, 678 P.2d 1138, 1141 (1984). We have created multi-factor tests for each of those three distinct estoppel claims. *In re Estate of Stukey*, 2004 MT 279, ¶ 38, 324 Mont. 241, 100 P.3d 114 (equitable estoppel); *Keil v. Glacier Park*, 188 Mont. 455, 462, 614 P.2d 502, 506 (1980) (promissory estoppel); and *Northwest Potato Sales, Inc.*, 208 Mont. at 317, 678 P.2d at 1142 (estoppel by silence).

¶23     *Stare decisis* "is a fundamental doctrine which reflects our concerns for stability, predictability and equal treatment." *Formicove Inc. v. Burlington Northern, Inc.*, 207 Mont. 189, 194, 673 P.2d 469, 472 (1983). Because this Court previously has treated promissory estoppel and equitable estoppel as legally distinct claims, we decline to use this case as a vehicle to merge those claims together under the *Restatement (Second) of Contracts* § 90. Instead, we apply the established multi-factor tests for promissory estoppel and equitable estoppel and hold that the District Court correctly concluded that the John Turners failed to establish a *prima facie* case for either promissory or equitable estoppel.

¶24     To establish a *prima facie* claim, the party asserting promissory estoppel must establish the following four elements: "(1) a promise clear and unambiguous in its terms; (2) reliance on the promise by the party to whom the promise is made; (3) reasonableness and foreseeability of the reliance; [and] (4) the party asserting the reliance must be injured by the reliance." *Keil*, 188 Mont. at 462, 614 P.2d at 506. The District Court concluded that "at no time did a Wells Fargo agent make . . . a 'clear and unambiguous'

9

promise to [the John Turners]" and therefore, the John Turners' promissory estoppel claim failed.

¶25 The John Turners object to that conclusion on appeal and argue that they have satisfied the first element of promissory estoppel. The John Turners allege that the "promise clear and unambiguous in its terms" occurred when James and Julie paid the outstanding balance on their line of credit down to zero and Wells Fargo wrote that the payment reflected a "mortgage payoff." That writing, the John Turners allege, was "sufficient for James Turner to assume the SmartFit Loan would be released . . . ."

¶26 Although Wells Fargo's statement might, in theory, satisfy the first element of promissory estoppel as applied to James Turner, the statement does not satisfy the first element as applied to the John Turners. The second element of promissory estoppel makes clear that only "the party to whom the promise is made" may assert reliance on that promise.

¶27 The John Turners argue that this Court abrogated the second element of promissory estoppel in *Tynes v. Bankers Life Co.*, 224 Mont. 350, 730 P.2d 1115 (1986) (superseded by statute on other grounds). The defendant in *Tynes*, Bankers Life Co., was an insurance company that had provided coverage to the plaintiffs, Walter Tynes and his son Kelley. *Tynes*, 224 Mont. at 353-54, 730 P.2d at 1117-18. In 1977, Kelley developed schizophrenia and Walter had Kelley admitted to the Constance Bultman Wilson Center, a hospital in Minnesota that required "verification of 100% financial coverage" prior to admission. *Tynes*, 224 Mont. at 354, 730 P.2d at 1118. The Tynes' promissory estoppel complaint "allege[d] that Bankers Life promised [the] Wilson Center

10

and Walter they would cover Kelley's expenses." *Tynes*, 224 Mont. at 359, 730 P.2d at 1121.

¶28 The Court in *Tynes* began its promissory estoppel discussion by citing *Keil* for the four elements required for a *prima facie* promissory estoppel claim. *Tynes*, 224 Mont. at 362, 730 P.2d at 1123. The Court then determined that the first and second elements of promissory estoppel were met in two different ways: (1) when "Bankers Life treated Kelley as an insured when it paid his medical bills in April of 1978"; and (2) when Bankers Life "represented to [the] Wilson Center that Kelley was an insured." *Tynes*, 224 Mont. at 362, 730 P.2d at 1123. The John Turners contend that if the first and second elements of the Tynes' promissory estoppel claim were met when Bankers Life made a promise to the Wilson Center, then *Tynes* must stand for the proposition that "someone other than the person who received the promise [is] entitled to assert the doctrine" of promissory estoppel. *Tynes*, however, did not change the elements of promissory estoppel as established in *Keil* and is factually distinguishable from this case.

¶29 The John Turners' interpretation of *Tynes* suggests that this Court implicitly overruled *Keil* four paragraphs after the Court held that *Keil* correctly "defined the elements of promissory estoppel." *Tynes*, 224 Mont. at 362, 730 P.2d at 1123. We reject that interpretation. A better reading of *Tynes* is that Bankers Life's representation to the hospital that Kelley was insured was not a promise that, standing alone, gave rise to a promissory estoppel claim, but instead was additional evidence of the promises Bankers Life previously had made to Walter and Kelley that it would cover Kelley's medical expenses. *Tynes*, 224 Mont. at 353-54, 730 P.2d at 1117-18. In contrast, the John

11

Turners do not allege that Wells Fargo ever made a promise to them; therefore, we hold that the District Court correctly concluded the John Turners failed to establish a *prima facie* promissory estoppel case.

¶30 To establish a *prima facie* claim of equitable estoppel, the party asserting that doctrine must allege the following six elements:

> (1) the existence of conduct, acts, language, or silence amounting to a representation or a concealment of a material fact; (2) these facts must be known to the party estopped at the time of his conduct, or at least the circumstances must be such that knowledge of them is necessarily imputed to him; (3) the truth concerning these facts must be unknown to the other party claiming the benefit of the estoppel at the time it was acted upon by him; (4) the conduct must be done with the intention, or at least the expectation, that it will be acted upon by the other party, or under circumstances both natural and probable that it will be so acted upon; (5) the conduct must be relied upon by the other party and, thus relying, he must be led to act upon it; and (6) he must in fact act upon it in such a manner as to change his position for the worse.

*In re Estate of Stukey*, ¶ 38. The District Court concluded that "at no time did a Wells Fargo agent make any representations" to the John Turners, and therefore that they failed to establish the first element of equitable estoppel. The only representation that Wells Fargo made directly to the John Turners occurred when James and John met with Brian Kimble, a banker at Wells Fargo. The meeting occurred in July 2009, almost three years after Julie last borrowed against the credit line agreement. Kimble told James and John that, in his opinion, Wells Fargo should have closed James and Julie's account when they paid its balance down to zero.

¶31 Kimble's statement could not have given rise to a claim of equitable estoppel because the John Turners' allegations do not satisfy at least three of the remaining

12

elements. They are unable to satisfy the fifth and sixth elements because they did not rely on Kimble's statement to their detriment, as evidenced by the fact that nearly three years had passed since they purchased the encumbered Shepherd property.

¶32 Although the Dissent reflects a suspicion that, because Julie was friends with Deborah Brown, the two colluded to conceal from James and the John Turners the advances made to Julie under the credit line agreement, even the John Turners acknowledge that "we do not know" whether any such collusion occurred after the August 4, 2006 meeting. The Dissent faults Wells Fargo for failing to inform James when Julie withdrew additional funds under the credit line agreement. The record shows, however, that James was on notice, from his Wells Fargo Portfolio Management Account statement for September 2006, that $120,000 had been advanced from the credit line agreement to his and Julie's joint checking account.

¶33 Wells Fargo, James and Julie agreed in Section 4 of the credit line agreement that Wells Fargo would advance funds "when it receive[d] a request given by *any person* who has signed this Agreement." (Emphasis added.) James had the unilateral right under Section 18 of the agreement to terminate the line of credit, as "*[a]ny one Borrower* can close the Account by paying in full and *sending a signed letter* to the Bank requesting that the account be closed." (Emphasis added.) It is undisputed that neither James nor Julie ever sent the Bank such a letter. When Wells Fargo made additional advances to Julie, it did not wrong the John Turners; instead, the Bank acted in conformity with the express terms of the contract to which James, Julie and Wells Fargo all agreed.

¶34 Even if the advance to Julie could be characterized as "silence amounting to . . . concealment of a material fact," the John Turners cannot satisfy the third element. We have held that "equitable estoppel requires that a complaining party must lack not only the actual knowledge itself, but also lack a readily available means of knowledge as to the true facts." *Cascade Dev., Inc. v. City of Bozeman*, 2012 MT 79, ¶ 26, 364 Mont. 442, 276 P.3d 862 (quoting *Elk Park Ranch v. Park Co.*, 282 Mont. 154, 166, 935 P.2d 1131, 1138 (1997)). It is undisputed that Wells Fargo recorded its Deed of Trust months before the John Turners purchased the Shepherd property. It is also undisputed that the Deed of Trust remained of record on the title when the John Turners recorded their quitclaim deed more than two months after the property changed hands and the Turners assumed the debt was paid. The John Turners could have learned that Wells Fargo retained its Deed of Trust on the Shepherd property had they examined the title prior to closing the sale. Because the John Turners are unable to satisfy all six elements, their equitable estoppel claim fails.

¶35 Finally, James and Julie conveyed title to the Shepherd property—and the John Turners accepted that title—via a quitclaim deed. Thus, the John Turners only received whatever title James Turner held, and that title, unfortunately, was burdened with Wells Fargo's of-record security interest. "It is axiomatic that a 'quitclaim deed transfers and is designed to transfer only such title and interest as the grantor had when [the grantor] delivered the title.'" *Dew v. Dower*, 269 Mont. 286, 290, 888 P.2d 421, 423 (1994) (quoting *Lodge v. Thorpe*, 120 Mont. 226, 229, 181 P.2d 598, 599-600 (1947)). *See also*

14

*Gibson v. Morris State Bank*, 49 Mont. 60, 72, 140 P. 76, 80 (1914) (even if paying full value, the grantee under a quitclaim deed takes such title only as the grantor has).

¶36    We therefore hold that the District Court correctly concluded that the John Turners were not entitled to judgment requiring Wells Fargo to release the Deed of Trust the bank holds on the Shepherd property. The District Court also correctly concluded that the John Turners failed to establish *prima facie* claims of promissory or equitable estoppel.

¶37    The District Court's October 11, 2011 order granting summary judgment to Wells Fargo is affirmed.

/S/ BETH BAKER

We concur:

/S/ MIKE McGRATH
/S/ JAMES C. NELSON
/S/ JIM RICE
/S/ BRIAN MORRIS

Justice Patricia O. Cotter dissents.

¶38    I dissent. I would apply the doctrine of equitable estoppel and conclude that Wells Fargo Bank (the Bank) should be estopped from asserting a first position with respect to its Deed of Trust, and that the Deed of Trust should be released as a lien on the Shepherd property.

¶39    The following facts are uncontroverted. On March 14, 2003, James Turner took title to the Shepherd property in his sole name via quit claim deed from Suzanne Turner.

15

On December 13, 2005, "James Duncan Turner, a married person and Julie A. Turner, a non-vested spouse" gave a Deed of Trust to the Bank secured by the Shepherd property in return for a loan.[1] On August 4, 2006, James and Julie met with Deborah Brown, their Wells Fargo banker, and informed her that the Shepherd property had been sold. They requested that Brown, a personal friend of Julie's, apply the sale proceeds to pay off the outstanding balance under the line of credit agreement. As instructed, Brown issued an Account Charge Notice, reflecting that the Bank had charged the account of James Turner the sum of $170,308.07. The stated reason for the charge was, in Brown's writing, a "mortgage payoff." One week later, Brown issued a corrected Account Charge Notice, reflecting a charge against James' account in the sum of $170,405.61; again, she noted that the reason for the charge was a "mortgage payoff." Subsequently, at Julie's request and without James' knowledge or agreement, and knowing that the property had been sold, Brown advanced to Julie in separate transactions the approximate sum of $170,000 on the line of credit. Brown knew that Julie was not a record owner of the Shepherd property and that the advances would constitute a lien upon the sold property.

¶40 The Court correctly sets forth the elements of equitable estoppel, but then proceeds to misapply the doctrine to the facts. The Court concludes that because the Bank never made any "representations" to the John Turners, the first element of equitable estoppel cannot be satisfied. To support this conclusion, the Court references a meeting between banker Brian Kimble and James and John that occurred in 2009, during which Kimble stated that the Bank should have closed the credit agreement account when James

[1] A non-vested spouse is one who does not have an ownership interest in the property.

and Julie paid its balance to zero. The Court reasons that because John did not rely on this statement to his detriment given its timing, he cannot satisfy the fifth and sixth elements of equitable estoppel. Opinion, ¶¶ 31-33. I submit that the Court has focused on the wrong conduct in concluding that the John Turners fail to satisfy the first and succeeding elements of equitable estoppel.

¶41 The first element of equitable estoppel is "the existence of conduct, acts, language, or silence amounting to a representation or a concealment of a material fact." Opinion, ¶ 36. Deborah Brown, a banker with actual knowledge that the property was sold and that James Brown intended to "pay off" the mortgage, allowed her friend Julie to make later draws against the paid credit agreement. Brown did not inform James of the advances, nor did she even inquire whether—given the sale of the property—James might want to alert the buyers of the new and accumulating lien against their property. Clearly, the new lien is a material fact that Brown concealed from James, the sole owner of the property, and by extension from the John Turners, the buyers of his property. Brown's conduct involving Julie and her ensuing silence under the circumstances satisfies the first element of equitable estoppel. The remaining elements are also met, given Brown's knowledge of the sale and the undisclosed advances, and James and John Turner's complete lack of knowledge of the advances and lien accumulation when undertaking the transfer of the property.

¶42 The Court and the concurring Justices fault the John Turners for not undertaking a title search before closing. A title search is surely well-advised in an arms-length transaction. Here, however, we have a transfer *between* brothers—brothers who

17

evidently had no cause to distrust one another, and who had no knowledge for over 18 months after the sale of Julie's clandestine actions. It makes perfect sense that one brother buying property from another would not deem it necessary to first retain a lawyer and secure title insurance. It is ludicrous to ascribe "folly" to them under these circumstances.

¶43 In our recent Opinion in *Cascade Development, Inc. v. City of Bozeman*, 2012 MT 79, 364 Mont. 442, 276 P.3d 862, we said that equitable estoppel "prevents one party from unconscionably taking advantage of a wrong while asserting a strict legal right, and will be invoked where 'justice, honesty, and fair dealing' are promoted." *Cascade Development*, ¶ 23 (citing *Selley v. Liberty Northwest Ins. Corp.*, 2000 MT 76, ¶ 11, 299 Mont. 127, 998 P.2d 156). The Court concludes that the Bank did nothing wrong. However, the conduct in question need not be intentionally or morally wrong in order to qualify for application of equitable estoppel. As we further noted in *Cascade Development*,

> The common law doctrine of equitable estoppel rests upon the general principle that "[w]hen one of two innocent persons—that is, persons each guiltless of an intentional, moral wrong—must suffer a loss, it must be borne by that one of them who by his conduct—acts or omissions—has rendered the injury possible."

*Cascade Development*, ¶ 26.

¶44 The Bank and Brown are in the business of lending money, securing the payment of loans, and releasing liens when loans are paid in full. James and John are not bankers. The Bank and Brown could have easily released the Deed of Trust once paid, as James expected (and as Kimble later corroborated to be the correct course of action). The Bank

18

and Brown could have easily alerted James of Julie's conduct, knowing full well that she was not an owner of the property and that James had sold the property assuming the mortgage had been paid and released. But the Bank did nothing. Instead, the Bank and Brown fell back upon the requirement that the request to release the Deed of Trust should have been in writing, thus asserting "a strict legal right" in refusing to release the Deed of Trust. Whether one assumes the Bank took advantage of its own wrong or that it was innocent, under *Cascade Development,* it is the Bank as the professional with actual knowledge of the lien problem, not the John Turners—who clearly did nothing wrong—who should suffer the loss. "Justice, honesty and fair dealing" compel such a result.

¶45    I would conclude that the John Turners have satisfied the six elements of equitable estoppel. I would invoke the doctrine and direct the Bank to release its Deed of Trust as a lien on the Shepherd property. I dissent from our refusal to do so.


/S/ PATRICIA COTTER


Justice Michael E Wheat joins the Dissent of Justice Patricia O. Cotter.


/S/ MICHAEL E WHEAT