DA 11-0382

IN THE SUPREME COURT OF THE STATE OF MONTANA

2012 MT 32

DR. PAUL WILLIAMSON, REV. DR. VERN KLINGMAN,
PATRICIA KLINGMAN, RUSSELL L. DOTY, JAMES
T. and ELIZABETH GRUBA, LEO G. and JEANNE
R. BARSANTI,

         Petitioners and Appellants,

   v.

MONTANA PUBLIC SERVICE COMMISSION
and NORTHWESTERN ENERGY,

         Respondents and Appellees.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
                 In and For the County of Yellowstone, Cause No. DV 10-1450
                 Honorable Susan P. Watters, Presiding Judge

COUNSEL OF RECORD:

       For Appellants:

            Russell L. Doty, Attorney at Law, Billings, Montana

       For Appellee Montana Service Commission:

            James C. Paine, Special Assistant Attorney General, Montana Service
            Commission, Helena, Montana

       For Appellee Northwestern Energy:

            Monica J. Tranel, Tranel, McCarter & Morris, PLLC, Helena, Montana

                       Submitted on Briefs:  November 23, 2011

                                   Decided:  February 14, 2012

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Appellants are a group of individuals who filed a complaint with the Montana Public Service Commission (Commission or PSC) against NorthWestern Energy (NorthWestern or NWE) concerning NorthWestern's provision of street lighting services. The PSC dismissed the complaint on the ground that the four named complainants lacked standing under § 69-3-321, MCA. Appellants then filed an amended complaint in which they named four additional complainants. The PSC decided that Appellants were procedurally barred from amending their complaint. Moreover, the PSC stated that it was not persuaded to reconsider its earlier ruling on standing in any event. Appellants sought review in the Thirteenth Judicial District Court, Yellowstone County. The District Court affirmed, and Appellants have now brought the case to this Court.

¶2 There are two issues on appeal: (1) whether the four original complainants have standing to pursue their complaint in the PSC under § 69-3-321, MCA, and (2) whether the PSC properly rejected the amended complaint. As to the first issue, we affirm the PSC's and the District Court's conclusions that the original complainants lack standing. As to the second issue, we conclude that the PSC's and the District Court's rationales for rejecting the amended complaint were incorrect, and we accordingly reverse and remand for further proceedings as detailed below.

## BACKGROUND

### Street Lighting Service

¶3 Title 7, chapter 12, part 43 of the Montana Code Annotated contains provisions relating to the creation of special improvement districts for lighting streets and highways.

3

Section 7-12-4301(1), MCA, authorizes the council of any city or town to create such districts. Once a street lighting district is created, the city or town council may arrange to have the posts, wires, pipes, conduits, lamps, or other suitable and necessary appliances procured and erected by contract, by the street commissioner, or by any other official of the city or town. Section 7-12-4308(1)(a), MCA. The costs of installing, maintaining, and supplying electrical current for the street lighting system are to be borne, in whole or in part, by the owners of property within the lighting district. Sections 7-12-4301(1)(b), -4321, MCA. The city or town council is authorized to assess and collect these costs by special assessment against said property. Section 7-12-4301(1)(c), MCA.

¶4 Under § 69-3-306(1), MCA, the PSC has authority to prescribe "classifications of the service of all public utilities." Such classifications may take into account the quantity used, the time when used, and any other reasonable consideration; and each public utility is required to conform its schedule of rates, tolls, and charges to such classifications. Section 69-3-306(1), MCA. Pursuant to this statute, the PSC has approved a number of customer classes for NorthWestern. The electric rates assessed each customer class vary based on cost-of-service studies and are designed to generate sufficient monies to meet the class revenue requirement. Examples of NorthWestern's customer classes include residential (governed by Tariff Schedule REDS-1), small commercial (Tariff Schedule GSEDS-1), large commercial (Tariff Schedule GSEDS-2), irrigation (Tariff Schedule ISEDS-1), and street and area lighting (Tariff Schedule ELDS-1).

¶5 NorthWestern directly bills the members of the street and area lighting class for the provision of street lighting service. Included within this class are municipalities, such

4

as the City of Billings and the City of Missoula, which pay the street lighting bills to NorthWestern. Property owners in the street lighting districts do not pay NorthWestern directly for the provision of street lighting service. But, as discussed below, Appellants contend that the property owners ultimately pay for the service because the city assesses the property owners within each district for the costs of the street lighting, as reflected by separate lines on their property tax bills. In addition, Appellants allege that persons residing outside the street lighting districts help defray, in general property taxes, the costs of street lighting.

### Appellants' Claims

¶6 Appellants brought this action seeking various types of relief. Primarily, they would like the PSC to require NorthWestern to replace existing high pressure sodium (HPS) street lights with light emitting diode (LED) street lights. Appellants contend that "[a]doption of new energy saving infrastructure technologies, such as LEDs, can play an important role in helping the United States and the State of Montana to achieve their goals to become more energy independent and to generate less $CO_2$ [carbon dioxide]." Appellants further contend that the costs of LED street lights "have now dropped to a level where we will waste more money and energy in the long run by waiting for future improvements and price cuts in LED luminaires than to move forward with LED street lighting projects."

¶7 Prior to the commencement of the instant action, the PSC initiated a proceeding to "investigate the technical and economic feasibility and possible adoption of rules related to the installation by regulated electric utilities of [LED] street and area lighting." The

5

PSC held an informal roundtable in April 2009. Various parties participated or provided comments, including NorthWestern, Montana-Dakota Utilities Co., and two of the complainants in the present case. NorthWestern and Montana-Dakota advised the PSC that, according to their analyses, "the costs of converting their existing street and area lighting to LED luminaires exceed the benefits at this time" and "payback periods could often exceed the life of the luminaire." The utilities also cited "legal and administrative problems" with adopting a street lighting rule. Ultimately, the PSC concluded that "LED technology is a promising technology, but is currently at a developmental stage that does not warrant a mandatory street and outdoor lighting conversion program." Thus, the PSC elected "not [to] pursue an LED street and outdoor lighting rulemaking at this time." The PSC noted, however, that NorthWestern and Montana-Dakota are both "obligated to acquire cost-effective energy efficiency and conservation in their resource planning processes." Accordingly, the PSC stated that it expected the utilities to "continue to monitor the technical and economic aspects of LED technology" and to "include consideration of LED lighting technology along with other energy efficiency alternatives when the utilities develop and submit their resource planning filings."

¶8 Appellants commenced the instant action in February 2010. While acknowledging the 2009 proceedings, Appellants distinguish the present proceeding on several grounds. Primarily, they contend that the cost-benefit analysis which NorthWestern presented to the PSC in 2009 failed to include consideration of so-called "ownership overcharges." In this regard, Appellants allege that many of the poles, mast arms, luminaires, and wiring of NorthWestern-owned street lights (which Appellants refer to collectively as "the street

6

lighting infrastructure") have been fully paid for—i.e., that NorthWestern has already recouped the full cost of these assets—and that NorthWestern customers should not have to continue paying "ownership charges" for them. (Appellants note that "ownership charges" do not include charges for the energy used, for transmission and distribution of that energy, and for billing, maintenance, and other such expenses.) Appellants further allege that in Billings alone, NorthWestern has collected millions of dollars in ownership charges *beyond* the cost of the street lighting infrastructure. Appellants opine that the same thing has occurred in other Montana cities and counties served by NorthWestern. They argue that NorthWestern should be required to disgorge these "ownership overcharges," which could then be used to defray the installation costs of switching to more energy efficient LED lighting.

¶9 Thus, while the utility companies asserted in the 2009 proceedings that "the costs of converting their existing street and area lighting to LED luminaires exceed the benefits at this time," Appellants argue here that the costs of conversion are substantially reduced or eliminated when the alleged ownership overcharges are factored into the equation. Appellants observe that their complaint "narrowly addresses the cases where a mandatory conversion [to LED technology] is warranted." For instance, based on their analysis of various street lighting districts in Billings, Appellants allege that the City of Billings is paying $60,742 per month in ownership overcharges and that these funds could instead be used to "pay for new energy efficient LED lighting *without an increased cost to NorthWestern's customers*" (emphasis in original). Appellants conclude that Billings taxpayers would pay roughly 80 percent less for street lighting if the wrongful ownership

7

charges were eliminated and the already-collected overcharges were used to pay for new LED lights. Again, they opine that this situation "undoubtedly" exists in other Montana cities and counties as well.[1]

**Original Complainants**

¶10 Appellants frame this case as a class action. The four original complainants are Dr. Paul Williamson, Rev. Dr. Vern Klingman, Patricia Klingman, and Russell L. Doty (collectively, Complainants). At the time the complaint and the amended complaint were filed, Williamson was a resident of Missoula. He alleges that he is "directly affected by local government taxes levied on street lighting districts in the city and county where he lives, pays rent, and works." He purports to represent "renters who pay rent that reflects the fee on the property tax for rental units that reflects the street lighting overcharge." Appellants note that Williamson has since moved out of state, but they assert that he will be replaced by another renter at some future time in the proceedings.

¶11 The Klingmans resided in Billings at the time the complaint and the amended complaint were filed. They were not residents of a street lighting district, but instead

---

[1] Besides the "ownership overcharge" issue, there are other distinctions between the instant action and the 2009 proceeding. First, the 2009 proceeding was a rulemaking proceeding initiated by the PSC, whereas the present action involves a formal complaint filed by Appellants against a public utility under § 69-3-321(1), MCA, regarding its rates, charges, practices, and service. Furthermore, in rejecting NorthWestern's "res judicata" and "collateral estoppel" arguments, the PSC observed that the 2009 proceeding was not conducted as a contested case and that the participants did not have an opportunity for meaningful discovery, were not allowed an opportunity for cross-examination of those submitting comments, and had no opportunity to brief the issues. In short, Appellants did not have "a full opportunity . . . to litigate their views" in the 2009 proceeding. The PSC also noted that Appellants' current complaint is "far broader" than the issues considered in 2009. Lastly, Appellants contend that LED technology and efficiency have improved in the intervening months since the 2009 proceeding.

claimed to be "directly affected by local government taxes they pay levied on street lighting districts where Yellowstone County and the City of Billings defray some of the costs of lighting districts where the street lights are owned by [NorthWestern]." The Klingmans purport to represent persons who reside outside of street lighting districts but who "help defray in general property taxes, the city's and county's pro-rata share of street lighting fees" in districts where those governments own property and NorthWestern owns and maintains the street lights. The Klingmans also have since moved out of state, but they paid property taxes through 2011 prior to leaving Montana. In addition, Appellants state that the Klingmans will be replaced, at some future time in the proceedings, by other Billings residents who do not live in a street lighting district.

¶12 Lastly, Doty also is not a resident of a street lighting district. Rather, he brings this action "as a private attorney general, taxpayer of the City of Billings who is directly affected by local government taxes he pays levied on street lighting districts where Yellowstone County and the City of Billings defray some of the costs of lighting districts where the street lights are owned by [NorthWestern]." Doty purports to represent "persons directly affected by NWE's inferior service from lights illuminating roadways they drive on and others directly affected by climate change exacerbated by the unnecessary $CO_2$ emissions caused by the waste of energy perpetuated by NorthWestern's outdated street lights."

**Motion to Dismiss**

¶13 NorthWestern filed a motion to dismiss on the ground that Complainants lack standing. NorthWestern cited § 69-3-321(1), MCA, which states that the PSC

9

shall proceed, with or without notice, to make such investigation as it may deem necessary upon a complaint made against any public utility by any mercantile, agricultural, or manufacturing society or club; by any body politic or municipal organization or association, the same being interested; *or by any person, firm, or corporation, provided such person, firm, or corporation is directly affected thereby*, that: (a) any of the rates, tolls, charges, or schedules or any joint rate or rates are in any way unreasonable or unjustly discriminatory; (b) any regulations, measurements, practices, or acts whatsoever affecting or relating to the production, transmission, delivery, or furnishing of heat, light, water, power, or regulated telecommunications service, or any service in connection therewith is in any respect unreasonable, insufficient, or unjustly discriminatory; or (c) any service is inadequate. [Emphasis added, paragraph breaks omitted.]

NorthWestern argued that Doty lacks standing because he is not "directly affected" by the complained-of rates. NorthWestern argued that Williamson and the Klingmans lack standing because they are not "directly affected in a way that is unique to them and distinct from the consuming public generally."

¶14 In response, Complainants clarified that they are not challenging the right of their respective cities and counties to spend taxes on street lighting. Rather, they challenge NorthWestern's allegedly "unreasonable and unjustly discriminatory rates, tolls, charges or schedules and practices relating to the furnishing of light" which have resulted in an "overcharge and profligate waste of energy." Complainants argued that they are "directly affected" primarily for "economic" and "climatic" reasons. First, they alleged that their property tax bills "are higher than they would otherwise be if the local governments where they live were not being overcharged; higher than they would be if 50% of the energy needed to light Billings streets at night were eliminated." Second, they alleged that they are directly affected "by the contribution to global warming and CO2 emissions that NWE's failure to take reasonable measures to curb greenhouse gases causes."

10

¶15 Besides the "directly affected" requirement of § 69-3-321(1), MCA, NorthWestern also relied on the rules of justiciability which limit courts to deciding only "cases" and "controversies." *See Plan Helena, Inc. v. Helena Regl. Airport Auth. Bd.*, 2010 MT 26, ¶¶ 6-8, 355 Mont. 142, 226 P.3d 567. NorthWestern argued that Complainants had not established standing because they had failed to allege a past, present, or threatened injury to a property or civil right that is distinguishable from the injury to the public generally. *See Fleenor v. Darby Sch. Dist.*, 2006 MT 31, ¶ 9, 331 Mont. 124, 128 P.3d 1048. Complainants argued, however, that "the rules on standing, announced by the Montana Supreme Court, while applicable to lawsuits filed in court, do not apply to this administrative proceeding." As support, they quoted from the April 2, 2009 decision of William L. Corbett, a University of Montana administrative law professor, who served as hearing examiner in a case before the Commissioner of Political Practices (*Fox v. Molnar*) involving several complaints filed by Mary Jo Fox against PSC Commissioner Brad Molnar. In addressing Molnar's motion to dismiss Fox's complaints for lack of standing, Professor Corbett concluded that the constitutional requirements for standing "are applicable only to judicial proceedings, not administrative proceedings."

¶16 Addressing this issue in the present case, the PSC found that Professor Corbett's analysis raised "legitimate issues as to whether the same standards to prove standing in causes of action initiated in federal or state courts are applicable to show standing in a case initiated before a state regulatory agency." In this regard, the PSC noted that the case-or-controversy requirement is imposed on federal and state courts by Article III of the United States Constitution and Article VII of the Montana Constitution, respectively.

11

*See Plan Helena*, ¶ 6. The PSC reasoned that actions initiated in a court, whose power is limited to deciding "cases" and "controversies," must be distinguished from actions initiated before an administrative agency, which is not subject to the same limitation. Agreeing with Professor Corbett, the PSC concluded that standing principles derived from the case-or-controversy requirement do not govern PSC proceedings. "The focus must be on the specific statute or statutes under which Complainants have made their filing and whether Complainants fall within the scope of the statute or statutes." Hence, the PSC likewise was not persuaded by Complainants' reliance on Rule 38.2.2101 of the Administrative Rules of Montana.[2] The PSC noted that a statute controls over an administrative rule, at least to the extent of any inconsistency or conflict. *See Haney v. Mahoney*, 2001 MT 201, ¶ 6, 306 Mont. 288, 32 P.3d 1254; § 2-4-305(6)(a), MCA.

¶17 Turning, then, to an analysis under § 69-3-321(1), MCA, the PSC first noted that NorthWestern directly bills the members of the street and area lighting class, and that these entities in turn pay the street lighting bills to NorthWestern. "Clearly," the PSC observed, "customers within [this] class, including the cities of Billings and Missoula and the counties of Yellowstone and Missoula, which are billed by NWE for street lighting service, would have standing" under the statute. Complainants, in contrast, are not members of the street and area lighting class and are not "directly paying" NorthWestern

---

[2] "Complaints may be made by the [PSC] on its own motion or by any person, having a legal interest in the subject matter, or any public utility concerned. Any public utility or other person likewise may complain of anything done or omitted to be done by the commission or any person over whom the commission has jurisdiction in violation of any law, rule, regulation or order administered or promulgated by the commission, pertaining to matters over which the commission has jurisdiction." Admin. R. M. 38.2.2101(1).

for the provision of street lighting service. Therefore, the PSC reasoned, they are only "indirectly" affected by NorthWestern's ELDS-1 rates.

¶18 As noted, Complainants alleged that a portion of their property taxes is being used to pay for street lighting. The PSC found, however, that Complainants had not sufficiently explained

> how the cities generate monies to pay street lighting bills; whether Complainants themselves pay lighting district fees in a district with NWE-owned street lights; how the cities or counties calculate lighting district fees to districts where NWE owns the street lights as distinguished from districts in which the city or county owns the street lights; whether lighting district fees are the only source of revenues for the cities or counties to pay their street lighting bills; how the city or county calculates lighting fees in areas where there are no street lighting districts, but where there are street lights; [and] why Complainant-Williamson would have standing as a renter, not a property owner or property tax paying or lighting district paying resident of Missoula.

¶19 Complainants had also argued that they are "third-party beneficiaries" under street lighting contracts between NorthWestern and the cities. The PSC reasoned, however, that the contracts between public utilities and municipalities addressing the provision of street lighting service do not establish the rates and charges for that service and, thus, that Complainants' supposed status as third-party beneficiaries of these contracts does not give them standing to contest NorthWestern's street lighting rates and charges.

¶20 Lastly, Complainants had argued that they have standing based on their right to a clean and healthful environment under Article II, Section 3 of the Montana Constitution. In this regard, they alleged various effects from the burning of fossil fuels, such as rising sea levels, more summer heat waves, declining crop yields, elimination of late summer water flows, increased wildfires, an enlarged range of disease-bearing insects, increased

stress on insurance and financial systems due to "freak storms," and destruction of the earth's biodiversity. The PSC observed, however, that Complainants had failed to allege that NorthWestern's street lighting service is powered exclusively or partially through the burning of fossil fuels. Furthermore, the PSC found that Complainants had failed to show that their requested relief would result in a cleaner and more healthful environment. The PSC noted that "[t]his Commission is interested in reducing the burning of fossil fuels." However, while "LED's are competitive in many situations, . . . they are not necessarily the best choice everywhere at their current stage of development." For all of these reasons, the PSC concluded that Complainants had failed to demonstrate standing under § 69-3-321(1), MCA.

**Amended Complaint**

¶21 Complainants filed a request for reconsideration, in conjunction with an amended complaint in which they named four additional complainants: James T. and Elizabeth A. Gruba, and Leo G. and Jeanne R. Barsanti. The Grubas and the Barsantis are residents of Billings. They allege that they live in street lighting districts and that they have been assessed and paid property taxes for street lighting services in these districts.

¶22 The PSC rejected the amended complaint and refused to reconsider its ruling on standing. The PSC "readily acknowledge[d]" that its procedural rules allow amendments to any pleading. *See* Admin. R. M. 38.2.1207; *see also* Admin. R. M. 38.2.2105 (allowing amendments to complaints). Nevertheless, the PSC deemed it "an issue of first impression" whether a party may amend its complaint after the PSC has issued an order dismissing the complaint. The PSC opined that dismissal "is akin to a judgment against

14

complainants" and that "the better rule" is not to allow an amendment to the complaint but, rather, to limit the complainants to seeking modification of the dismissal order.

¶23 The PSC then noted that even if it allowed the amended complaint here, the only significant modifications to the original complaint consist of revised dollar amounts and the addition of four new complainants. The PSC observed that "[t]he added complainants may very well pay street lighting district fees assessed by local city or county governments," but the PSC decided that "such circumstances do not present a persuasive, compelling reason to reconsider the Commission's findings that Complainants do not possess standing to contest NWE's street lighting rates as they are not 'directly' affected by [those] rates." The PSC rebuffed Complainants' argument that its interpretation of the word "directly" had been too narrow. The PSC adopted the view that although the residents of a city or county are primarily and legally responsible to the city or county for taxes levied or street lighting district fees assessed, it is the members of the street lighting customer class (i.e., the city or county) who are primarily and legally responsible for billings from NorthWestern for the provision of street lighting services, and thus only the members of this class are directly affected by NorthWestern's rates.

**District Court Review**

¶24 The District Court affirmed. First, the court concluded that the PSC's rejection of the amended complaint was proper because "the amended complaint was not merely filed after notice of the hearing, but filed after the hearing was held . . . ." *See* Admin. R. M. 38.2.1207. The PSC concedes on appeal that this statement is incorrect, as there was no hearing at the administrative agency level. But the PSC asks us to affirm nonetheless

15

based on the PSC's "better rule" approach discussed above.  Second, as to the standing question, the District Court concluded that Complainants are not directly affected by NorthWestern's street lighting rates because NorthWestern bills the municipalities, not the individual taxpayers, for the street lighting service.  "Since the municipalities comprised the customer class for NWE's street and area lighting services, it follows that they were the only potential parties who could have challenged NWE's Tariff Schedule ELDS-1 Rates.  [Complainants] were not members of the ELDS-1 class of customers and therefore lacked standing to mount such a challenge."

## STANDARDS OF REVIEW

¶25    As a general rule, judicial review of a final agency decision must be conducted by the court without a jury and must be confined to the record.  Section 2-4-704(1), MCA. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced either because findings of fact upon issues essential to the decision were not made although requested, or because the administrative findings, inferences, conclusions, or decisions are (i) in violation of constitutional or statutory provisions; (ii) in excess of the statutory authority of the agency; (iii) made upon unlawful procedure; (iv) affected by other error of law; (v) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (vi) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. Section 2-4-704(2), MCA.  A finding of fact is clearly erroneous if it is not supported by substantial evidence in the record, if the fact-finder misapprehended the effect of the evidence, or if a review of the record leaves the court with a definite and firm conviction

16

that a mistake has been made. *Denke v. Shoemaker*, 2008 MT 418, ¶ 39, 347 Mont. 322, 198 P.3d 284. In reviewing conclusions of law, the court must determine whether the agency's interpretation and application of law are correct. *Knowles v. State ex rel. Lindeen*, 2009 MT 415, ¶ 22, 353 Mont. 507, 222 P.3d 595. These standards apply to both the District Court and this Court. *Knowles*, ¶ 23.

## DISCUSSION

¶26 ***Issue 1. Do the original complainants have standing under § 69-3-321, MCA?***

**Governing Law**

¶27 As an initial matter, it is necessary to identify the law which governs the standing question presented in this case. Like it did in the PSC proceedings, NorthWestern again injects case-or-controversy principles into the analysis of Appellants' standing before the PSC. NorthWestern observes that the power to adjudicate a case is limited to justiciable controversies, and that the central concept of justiciability incorporates the more specific doctrine of standing which is governed by its own set of substantive rules. *See Greater Missoula Area Fedn. of Early Childhood Educators v. Child Start, Inc.*, 2009 MT 362, ¶¶ 22-23, 353 Mont. 201, 219 P.3d 881. NorthWestern argues that Appellants have not satisfied these rules.

¶28 The question of standing is whether the litigant is entitled to have the merits of the dispute decided—more specifically, whether the litigant has alleged " 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues.' " *Olson v. Dept. of Revenue*, 223 Mont. 464, 469, 726 P.2d 1162, 1166 (1986) (quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S. Ct. 691,

17

703 (1962)); *Heffernan v. Missoula City Council*, 2011 MT 91, ¶¶ 29-30, 360 Mont. 207, 255 P.3d 80. In relation to the courts, the requirement of standing arises from two sources: the Constitution, which limits the judicial power to deciding only cases and controversies, and the courts themselves, which have adopted discretionary limitations on the exercise of judicial power for prudential reasons. *See Heffernan*, ¶¶ 31-33; *Greater Missoula*, ¶ 22. To meet the case-or-controversy requirement, the plaintiff must clearly allege a past, present, or threatened injury to a property or civil right, and the injury must be one that would be alleviated by successfully maintaining the action. *Heffernan*, ¶ 33. Beyond this irreducible constitutional minimum of standing, this Court has adopted prudential rules under which a litigant may assert only her own constitutional rights or immunities, and the alleged injury must be distinguishable from the injury to the public generally, though not necessarily exclusive to the plaintiff. *Heffernan*, ¶ 33. Having been adopted essentially as matters of judicial self-governance, these prudential rules are subject to exceptions. *See Heffernan*, ¶¶ 32-33. For example, a physician may have standing to litigate the constitutional rights of her patient despite the prudential rule that a litigant may assert only *her own* constitutional rights or immunities. *Armstrong v. State*, 1999 MT 261, ¶¶ 8-13, 296 Mont. 361, 989 P.2d 364. Likewise, the rule that "the alleged injury must be distinguishable from the injury to the public generally" serves to prevent litigants from using the courts as a forum in which to air generalized grievances, but it does not preclude standing by a litigant who alleges an actual injury which happens to be shared by a large segment of the populace. *Helena Parents Commn. v. Lewis and Clark County Commrs.*, 277 Mont. 367, 372-74, 922 P.2d 1140, 1143-44 (1996).

¶29    While acknowledging that these standing requirements arose as limitations on the judicial power of Montana's courts, NorthWestern seeks to import them into PSC proceedings. This is incorrect. "The judicial power of the state is vested in one supreme court, district courts, justice courts, and such other courts as may be provided by law." Mont. Const. art. VII, § 1. The PSC is not a "court." It is an Executive Branch agency. *See* §§ 2-15-101, -2602, MCA. To be sure, there are various Executive Branch boards and commissions that exercise a quasi-judicial function as part of their mandate.[3] A "quasi-judicial function" is "an adjudicatory function exercised by an agency, involving the exercise of judgment and discretion in making determinations in controversies." Section 2-15-102(10), MCA. This may include holding hearings; evaluating and passing on facts; interpreting, applying, and enforcing existing rules and laws; granting or denying privileges, rights, or benefits; awarding compensation; and ordering action or abatement of action. Section 2-15-102(10), MCA. Having a quasi-judicial function, however, does not necessarily make these bodies Article VII courts.

---

[3] *See e.g.* §§ 2-15-1704(5) (Board of Labor Appeals), -1706(3) (Human Rights Commission), -1819(5)(a) (Board of Research and Commercialization Technology), -2029(1)(a) (Public Safety Officer Standards and Training Council), -2502(8) (Transportation Commission), -3105(4) (Board of Milk Control), -3303(4) (Board of Oil and Gas Conservation), -3402(5) (Fish, Wildlife, and Parks Commission), MCA.

¶30    In the federal system,[4] administrative adjudications are not considered Article III proceedings to which case-or-controversy or prudential standing requirements apply. *Gardner v. F.C.C.*, 530 F.2d 1086, 1090 (D.C. Cir. 1976); *Ritchie v. Simpson*, 170 F.3d 1092, 1094-95 (Fed. Cir. 1999). "Agencies are not Article III creatures, and Congress may allow anyone it wishes, including members of the public at large, to become parties in agency proceedings." *City of St. Louis v. Dept. of Transp.*, 936 F.2d 1528, 1532 (8th Cir. 1991). An agency's responsibility for implementation of statutory purposes justifies a wider discretion, in determining what actions to entertain, than is allowed to the courts by the Constitution or prudential standing rules. *Ecee, Inc. v. Fed. Energy Reg. Commn.*, 645 F.2d 339, 349-50 (5th Cir. 1981); *see also Envirocare of Utah, Inc. v. Nuclear Reg. Commn.*, 194 F.3d 72, 74 (D.C. Cir. 1999) (the criteria for establishing "administrative standing" may permissibly be less demanding than the criteria for "judicial standing"). Hence, "within their legislative mandates, agencies are free to hear actions brought by parties who might be without standing if the same issues happened to be before a federal court." *Ecee*, 645 F.2d at 349; *accord Wilcox Elec., Inc. v. F.A.A.*, 119 F.3d 724, 727 (8th Cir. 1997). Conversely, even if a party meets the criteria for judicial standing, the party might nevertheless lack administrative standing if the governing statutes do not

---

[4] We may consider federal justiciability principles to the extent they are relevant and persuasive. *See e.g. Chovanak v. Matthews*, 120 Mont. 520, 525-26, 188 P.2d 582, 584-85 (1948); *Helena Parents*, 277 Mont. at 371-74, 922 P.2d at 1142-44; *Armstrong*, ¶¶ 7-13; *Columbia Falls Elem. Sch. Dist. No. 6 v. State*, 2005 MT 69, ¶¶ 14-19, 326 Mont. 304, 109 P.3d 257; *Havre Daily News, LLC v. City of Havre*, 2006 MT 215, ¶¶ 20, 33-36, 333 Mont. 331, 142 P.3d 864; *Plan Helena, Inc. v. Helena Regl. Airport Auth. Bd.*, 2010 MT 26, ¶¶ 6-9, 355 Mont. 142, 226 P.3d 567; *Griffith v. Butte Sch. Dist. No. 1*, 2010 MT 246, ¶ 24, 358 Mont. 193, 244 P.3d 321; *Heffernan*, ¶¶ 42-46.

contemplate participation by that party. *See e.g. Envirocare*, 194 F.3d at 74-79. In short, standing under the Constitution is not required for administrative proceedings, nor is it sufficient to guarantee access to them. A litigant's standing before an administrative agency depends on the language of the statute and regulations which confer standing before that agency. *Ritchie*, 170 F.3d at 1095; *Ecee*, 645 F.2d at 350.

¶31    It is not necessary in the present case to identify precisely all of the factors that distinguish a "court" from an "administrative agency." Necessarily, this determination depends on the powers, duties, and functions of the particular body. Here, the PSC is vested with the duty to supervise, regulate, and control the operations of public utilities, common carriers, railroads, and other regulated industries. Sections 69-1-102, 69-3-102, MCA. The PSC is specifically *not* vested with judicial powers. Section 69-3-103(1), MCA ("[N]othing in this chapter shall be construed as vesting judicial powers on said commission or as denying to any person, firm, association, corporation, municipality, county, town, or village the right to test in a court of competent jurisdiction the legality or reasonableness of any fixed order made by the commission in the exercise of its duties or powers."). "The proceedings before the commission are investigative on the part of the commission, although they may be conducted in the form of adversary proceedings." Admin. R. M. 38.2.302(1); *see also e.g.* § 69-3-103(2)(a), MCA (authorizing the PSC to adopt rules relative to its "inspections, tests, audits, and investigations"). Certain PSC matters are to be conducted specifically in accordance with the Montana Administrative Procedure Act (Title 2, chapter 4, MCA). *See e.g.* §§ 69-3-108(6), 69-3-303(2), 69-3-1305(3), 69-3-1309(1), (2), MCA. And review of PSC decisions is under the same

21

standards that apply to review of agency decisions generally. *Compare* §§ 69-3-402 and -404, MCA, *with* §§ 2-4-702 and -704, MCA.

¶32 For these reasons, we conclude that the PSC is an administrative agency. As such, satisfaction of the case-or-controversy and prudential standing requirements that are applicable to the courts is not required in order to litigate a complaint before the PSC. We agree with the PSC that Appellants' standing is governed by § 69-3-321(1), MCA. Again, this statute directs the PSC

> to make such investigation as it may deem necessary upon a complaint made against any public utility . . . *by any person, firm, or corporation, provided such person, firm, or corporation is directly affected thereby*, that: (a) any of the rates, tolls, charges, or schedules or any joint rate or rates are in any way unreasonable or unjustly discriminatory; (b) any regulations, measurements, practices, or acts whatsoever affecting or relating to the production, transmission, delivery, or furnishing of heat, light, water, power, or regulated telecommunications service, or any service in connection therewith is in any respect unreasonable, insufficient, or unjustly discriminatory; or (c) any service is inadequate.

Section 69-3-321(1), MCA (emphasis added, paragraph breaks omitted). The dispositive question is whether Appellants are "directly affected" by NorthWestern's rates, tolls, charges, schedules, practices, or service in the provision of street lighting. The focus here, under Issue 1, is on the four original complainants: Williamson, the Klingmans, and Doty. (The Grubas and the Barsantis are discussed under Issue 2.)

¶33 Because this issue arises within the context of a motion to dismiss, the following rules guide the analysis.[5] The only relevant document when considering a motion to

---

[5] The rules discussed here are based on the Montana Rules of Civil Procedure. Although the Montana Rules of Civil Procedure do not govern PSC proceedings, "they may still serve as guidance for the agency and the parties." *Citizens Awareness Network*

dismiss is the complaint and any documents it incorporates by reference. *Cowan v. Cowan*, 2004 MT 97, ¶ 11, 321 Mont. 13, 89 P.3d 6. A motion to dismiss has the effect of admitting all well-pleaded allegations in the complaint. *Cowan*, ¶ 10. In considering the motion, the complaint is construed in the light most favorable to the plaintiff (or, as here, the complainant), and all allegations of fact contained therein are taken as true. *Cowan*, ¶ 10. It is not necessary, however, to take as true legal conclusions or allegations that have no factual basis or are contrary to what has already been adjudicated. *Cowan*, ¶ 14.

**Complainants' Theories of Standing**

¶34 Williamson, the Klingmans, and Doty are not property owners in a street lighting district and are not directly assessed for the costs of street lighting. They premise their standing instead on climatic, "general property taxes," safety, contractual, constitutional, and "special expertise" theories. We consider each of these in turn, starting with their claim that they are directly affected "by climate change exacerbated by the unnecessary $CO_2$ emissions caused by the waste of energy perpetuated by NorthWestern's outdated street lights." Complainants assert that continued use of inefficient lights contributes to the unnecessary burning of fossil fuels, which in turn brings about effects such as a "3-foot sea level rise within this century which . . . will displace more than 100 million

---

*v. Mont. Bd. of Envtl. Review*, 2010 MT 10, ¶ 20, 355 Mont. 60, 227 P.3d 583. In fact, NorthWestern cited M. R. Civ. P. 12(b)(6), and this Court's cases applying that rule, as the "legal standard" for deciding its motion to dismiss. The PSC has the power to "adopt and publish reasonable and proper rules to govern its proceedings." Section 69-3-103(2)(b), MCA; *see also e.g.* Admin. R. M. 38.2.2107(2) (recognizing motions to dismiss). In the absence of rules published by the PSC addressing the standards for evaluating motions to dismiss, the following rules serve as guidance.

people," "more summer heat waves that kill people because nighttime temperatures do not cool enough," a "decline in wheat, corn, and rice yields," "complete elimination of late summer water flows in many rivers and streams," "increased prairie and forest fires brought on by parched vegetation," an "enlarged range of disease-bearing insects that will cause an additional 80 million cases of malaria a year," and "overwhelming upward stress on home insurance rates as climate 'weirding' produces freak storms."

¶35 While expressing no views on the merits of Complainants' concerns,[6] we conclude that these sorts of effects are too attenuated to satisfy § 69-3-321(1), MCA. Indeed, such a broad interpretation of "directly affected" would nullify the statute's distinctive standard. NorthWestern's continued use of HPS street lights, instead of LED lights, may "affect" Complainants through the chain of events they have alleged—i.e., by creating needless carbon dioxide emissions which contribute to climate changes which cause the consequences listed above. But it is not plausible to say that Complainants are, in this way, "directly affected" by the continued use of HPS lights.

¶36 When interpreting a statute, we seek to implement the intention of the Legislature. Section 1-2-102, MCA. To determine legislative intent we look first to the plain meaning of the words of the statute. *In re K.M.G.*, 2010 MT 81, ¶ 26, 356 Mont. 91, 229 P.3d 1227. Words used by the Legislature must be given their usual and ordinary meaning. *Rocky Mt. Bank v. Stuart*, 280 Mont. 74, 80, 928 P.2d 243, 246-47 (1996). Where the

---

[6] *See Arreola v. Godinez*, 546 F.3d 788, 794-95 (7th Cir. 2008) ("Although the two concepts unfortunately are blurred at times, standing and entitlement to relief are not the same thing. Standing is a prerequisite to *filing suit,* while the underlying merits of a claim (and the laws governing its resolution) determine whether the plaintiff is *entitled to relief.*" (emphases in original)).

language is clear and unambiguous, the statute speaks for itself and we will not resort to other means of interpretation. *Rocky Mt. Bank*, 280 Mont. at 80, 928 P.2d at 246.

¶37 Under § 69-3-321(1), MCA, a person making a complaint must be not merely affected, but *directly* affected by the public utility's rates, tolls, charges, schedules, regulations, measurements, practices, acts, or service. "Directly" means "in a direct manner." *Merriam-Webster's Collegiate Dictionary* 328 (10th ed., Merriam-Webster 1997). "Direct" in this context means "stemming immediately from a source," "marked by absence of an intervening agency, instrumentality, or influence," or "characterized by close logical, causal, or consequential relationship." *Merriam-Webster's Collegiate Dictionary* 328; *see also Black's Law Dictionary* 525 (Bryan A. Garner ed., 9th ed., Thomson Reuters 2009) ("Free from extraneous influence; immediate <direct injury>."). The climate-related consequences alleged by Complainants do not stem *immediately*— without intervening agency, instrumentality, or influence—from the continued use of HPS lights. They do not even bear a *close* logical, causal, or consequential relationship to the use of HPS lights rather than LED lights—particularly given the PSC's unrefuted determination that LEDs "are competitive in many situations, but they are not necessarily the best choice everywhere at their current stage of development."

¶38 Complainants' other theories of standing fail for similar reasons. First, they claim to be directly affected by the rates charged for street lighting because they pay general property taxes to the cities and counties within which they reside[7] and these taxes are

---

[7] Williamson alleges that he "defrayed in rent he paid, part of the fee on the property tax statements for the dwelling wherein he resided."

then used by the cities and counties to defray a portion of the street lighting costs billed by NorthWestern. Complainants' allegations in this regard are speculative, however. As the PSC noted, Complainants fail to allege how the cities and counties generate monies to pay street lighting bills; how the cities and counties calculate lighting district fees for districts where NorthWestern owns the street lights, versus districts where the city or county owns the street lights; whether lighting district fees are the only source of revenue for the cities and counties to pay their street lighting bills; and how the cities and counties calculate lighting fees in areas where there are street lights but no street lighting districts. In any event, even if some of the general property taxes paid by Complainants are used by the cities and counties to help defray the costs of street lighting, paying general property taxes does not, in itself, establish a sufficiently close logical, causal, or consequential relationship to NorthWestern's street lighting rates to make Complainants "directly affected" thereby. The same is true of Williamson's rent payments.

¶39 Second, Complainants point out that they are challenging not only NorthWestern's rates, but also its "service." *See* § 69-3-321(1)(c), MCA. They contend that they are directly affected "by NWE's inferior service from lights illuminating roadways they drive on." They allege that converting to LED lights will create "improved road safety because drivers will be able to see better under the superior, more uniform, scotopic light emitted by LEDs." Yet, even if this is true, mere dissatisfaction with the quality of luminaires—without any allegation that the person resides in the street lighting district and is assessed the costs of the street lighting—is insufficient to make the person "directly affected" by NorthWestern's service. Otherwise, anyone who passes through a Montana city and

finds the quality of NorthWestern's street lights "inferior" could file a complaint with the PSC. We interpret a statute to give effect to its purpose. *In re Marriage of McMichael*, 2006 MT 237, ¶ 14, 333 Mont. 517, 143 P.3d 439. The Legislature did not contemplate the sort of boundless standing proposed by Complainants under this theory.

¶40 Third, Complainants claim standing as third-party beneficiaries of various street lighting contracts which their local governments entered into with NorthWestern. There are several problems with this theory. For one thing, Complainants point to no language in § 69-3-321, MCA, authorizing them to bring an action for breach of contract in the PSC. Furthermore, Complainants fail to identify specifically what provision of these contracts they seek to enforce through this action. And lastly, not everyone who may benefit from performance, or suffer from nonperformance, of a contract between two other parties is permitted to enforce the contract. *Diaz v. Blue Cross and Blue Shield of Mont.*, 2011 MT 322, ¶ 18, 363 Mont. 151, ___ P.3d ___. A stranger to a contract lacks standing to bring an action for breach of that contract unless he is an *intended* third-party beneficiary of the contract. *Dick Anderson Constr., Inc. v. Monroe Constr. Co.*, 2009 MT 416, ¶ 46, 353 Mont. 534, 221 P.3d 675. A plaintiff cannot assume that he is an intended third-party beneficiary; rather, he must show from the face of the contract that it was intended to benefit him. *Diaz*, ¶¶ 19, 21; *see also Dick Anderson Constr.*, ¶ 47 (defining an intended third-party beneficiary). Complainants fail to do so here.

¶41 Fourth, Complainants claim standing based on the Montana Constitution. They contend that they have the right to obtain a speedy remedy for their injuries. *See* Mont Const. art. II, § 16 ("Courts of justice shall be open to every person, and speedy remedy

27

afforded for every injury of person, property, or character. . . .”). Denying Complainants standing in the PSC, however, does not deny them access to the courts, nor does it deny them the right to seek full legal redress in a court of justice for any injuries they have suffered. Complainants also contend that they have the right to a clean and healthful environment. *See* Mont Const. art. II, § 3 (“All persons are born free and have certain inalienable rights” including “the right to a clean and healthful environment . . . .”). Yet, Complainants do not explain why the failure to convert to LED street lights at this juncture amounts to a violation of Article II, Section 3. The PSC found that LEDs “are competitive in many situations, but they are not necessarily the best choice everywhere at their current stage of development.” The PSC determined that Complainants' allegations did not show a reduction in electricity generation if HPS lights were replaced with LED lights. The PSC concluded, therefore, that Complainants had not established that their requested relief would result in a cleaner and more healthful environment. Complainants fail to refute these determinations.

¶42     Finally, citing *Singleton v. Wulff*, 428 U.S. 106, 96 S. Ct. 2868 (1976), Williamson and Doty assert that they have “standing to protect the rights of others in the general rate paying public who do not have the scientific or ratemaking expertise to bring action on their own behalf.” *Singleton* involved a challenge by physicians to a Missouri abortion statute. The Supreme Court first held that the physicians had standing in their own right because they had established a concrete injury to themselves from the statute's operation. *Singleton*, 428 U.S. at 112-13, 96 S. Ct. at 2873. A plurality of four Justices then concluded, “as a prudential matter,” that the physicians could “assert the rights of women

patients as against governmental interference with the abortion decision." *Singleton*, 428 U.S. at 112, 118, 96 S. Ct. at 2873, 2876. This rule was premised on the closeness of the physician-patient relationship and recognition of several obstacles to a woman's ability to assert her own rights. *Singleton*, 428 U.S. at 117-18, 96 S. Ct. at 2875-76; *see also Armstrong v. State*, 1999 MT 261, ¶¶ 9-13, 296 Mont. 361, 989 P.2d 364 (applying *Singleton*). Here, Williamson and Doty state that they have "special expertise" to address "dangers and wrongs in the complicated areas of climate change and utility ratemaking and service that have eluded the average citizen and even regulators tasked with addressing those issues." Yet, the issue here is not whether we should adopt an exception to the prudential rule that a litigant may assert only *his own* rights (*see* ¶ 28, *supra*) and allow litigants with "special expertise" to assert the rights of third parties. Rather, the issue is whether Complainants have met the *statutory* standard. The fact that Williamson and Doty may have special expertise in this field does not establish that they are directly affected by NorthWestern's rates, tolls, charges, schedules, practices, or service.

¶43 In sum, Complainants' allegations fail to establish that they are "directly affected" under § 69-3-321(1), MCA. Accordingly, the PSC and the District Court did not err in concluding that Williamson, the Klingmans, and Doty lack standing.

¶44 ***Issue 2. Did the PSC properly reject the amended complaint?***

¶45 Following the PSC's ruling on their lack of standing, Complainants filed an amended complaint in which they named four additional complainants: the Grubas and the Barsantis. In summary, the Grubas allege as follows: they are residents of Billings; they live within two street lighting districts; they have been assessed and paid taxes for

29

street lighting services in these districts, as shown by separate lines on their property tax bills; NorthWestern owns the street lights in these districts; the street lighting infrastructure in these districts was fully paid for by January 1, 2007, but the ownership charge that NorthWestern was imposing to recoup the cost of the street lighting infrastructure did not cease; as a result, the Grubas and other similarly situated property owners have been paying too much for street lighting service over the last several years; this overcharge could be applied to purchasing more energy efficient lighting without any increased assessment to property tax payers; and if LED street lights were installed and the ownership charge were eliminated, the Grubas' bill would drop by 86 percent within 3.7 years. Therefore, the Grubas contend, they are directly affected by NorthWestern's allegedly improper rates and ownership overcharges which have resulted in their paying property tax bills that were several hundred dollars too high.

¶46 The Barsantis are also residents of Billings who live in a street lighting district. Their allegations are substantially the same. In short, the Barsantis have been paying for street lighting as part of their property taxes, but they allegedly have been overcharged because NorthWestern has continued to bill the City of Billings an ownership charge for the street lighting infrastructure in that district, even though the full cost of the street lighting infrastructure was fully recouped as of August 12, 1998. The Barsantis assert that the overcharge could be applied to purchasing more energy efficient lighting, which ultimately will reduce their property tax bills by 88 percent within 3.1 years. They claim that they have been directly affected by NorthWestern's allegedly improper rates and

ownership overcharges because their cumulative property tax bill over the last decade was approximately $621 too high.

¶47 In rejecting the amended complaint, the PSC cited two grounds: (1) the amended complaint is procedurally barred and (2) the Grubas and the Barsantis do not have standing under § 69-3-321(1), MCA, in any event. The District Court, in its review of the PSC's decision, affirmed the PSC as to both grounds. Appellants contend and we agree, however, that the PSC and the District Court erred in these two determinations.

¶48 First, as to the Grubas' and the Barsantis' standing, the PSC and the District Court interpreted "directly affected" to mean that only the customers in the street and area lighting class—i.e., the cities and counties—have standing to challenge NorthWestern's rates and charges for street lighting service. In other words, only the parties that write the check directly to NorthWestern for the street lighting bill are directly affected by the rates, charges, and service. We cannot agree that this restrictive construction is consistent with the intent of § 69-3-321(1), MCA. The statute grants standing to "persons," not just "customers," and the critical language is "directly affected," not "directly pays." Under the PSC's approach, large categories of persons could be precluded from pursuing legitimate complaints in the PSC through the mere expedient of structuring customer classes, rate classifications, and billing practices such that consumers pay energy fees to an intermediary which in turn pays NorthWestern directly. The PSC's construction also is contrary to the intent of §§ 7-12-4301(1) and -4321, MCA. These statutes contemplate a sort of "pass-through" system under which the costs of installing, maintaining, and supplying electrical current for street lighting are to be borne by the owners of property

31

within the street lighting district, and the governing body is thus authorized to assess and collect these costs by special assessment against said property. Where that occurs—i.e., where the costs of street lighting are assessed and collected by the city or county from the property owners in the street lighting district—we conclude that there is a sufficiently close logical, causal, or consequential relationship between (a) NorthWestern's rates and charges and (b) the taxes paid by the property owners specifically for street lighting in the street lighting district, to satisfy § 69-3-321(1), MCA. *See* ¶ 37, *supra*.

¶49 Taking the Grubas' and the Barsantis' well-pleaded allegations as true, they allege that they live in street lighting districts and that they have been assessed and paid taxes for street lighting services in these districts as shown by separate lines on their property tax bills (which they have attached to their pleadings). These allegations are sufficient to establish that the Grubas and the Barsantis are "directly affected" by NorthWestern's rates and charges under § 69-3-321(1), MCA. The PSC's and the District Court's contrary conclusions are reversed.

¶50 Second, as to the procedural bar, the PSC's rules allow pleadings and complaints to be amended. *See* Admin. R. M. 38.2.1207, 38.2.2105. Nevertheless, the PSC posited that an order dismissing the complaint "is akin to a judgment against complainants" and that "the better rule" is not to allow an amendment to the complaint but, rather, to limit the complainants to seeking modification of the dismissal order. In essence, the PSC created a categorical rule that amendments to a complaint are impermissible following a dismissal order. In this respect, the PSC was mistaken.

32

¶51    The policy of the law[8] "is to permit amendments to the pleadings in order that litigants may have their causes submitted upon every meritorious consideration that may be open to them; therefore, it is the rule to allow amendments and the exception to deny them." *Union Interchange, Inc. v. Parker*, 138 Mont. 348, 353-54, 357 P.2d 339, 342 (1960). This does not mean, of course, that a motion to amend must be automatically granted. *Allison v. Town of Clyde Park*, 2000 MT 267, ¶ 20, 302 Mont. 55, 11 P.3d 544. The decision to grant or deny a motion to amend lies within the court's—or, as here, the PSC's—discretion. *Farmers Coop. Assn. v. Amsden, LLC*, 2007 MT 286, ¶ 12, 339 Mont. 445, 171 P.3d 690; Admin. R. M. 38.2.1207, 38.2.2105.[9]

¶52    We have recognized that a complaint may be amended to cure deficiencies related to a party's standing. *See e.g. Weaver v. Adv. Refrigeration*, 2011 MT 174, ¶¶ 15-17, 361 Mont. 233, 257 P.3d 378 (Weaver did not have standing to bring the action, but he could have amended his complaint to substitute the real party in interest); *Boehm v. Cokedale, LLC*, 2011 MT 224, ¶¶ 13-21, 362 Mont. 65, 261 P.3d 994 (Boehm could have substituted the real party in interest to pursue the claims at issue). In creating its new

---

[8] Again, the principles discussed here serve as guidance in the absence of rules published by the PSC detailing the circumstances in which amendments to pleadings and complaints are permissible or impermissible. *See* ¶ 33 n. 5, *supra.*

[9] Admin. R. M. 38.2.1207(1) ("Any pleading or document may be amended prior to notice of the hearing. After notice of a hearing is issued, motion for leave to amend any pleading or document may be filed with the commission and may be authorized in the discretion of the commission or the hearing examiner. . . . Post-notice amendments to any pleading or document shall not unduly broaden the scope of the issues originally filed with the commission, unless the commission shall in its discretion allow such amendments. . . ."); Admin. R. M. 38.2.2105(1) ("Amendments to complaints shall comply with all requirements of a complaint as heretofore enumerated. The amendment may, in the discretion of the commission, be allowed.").

categorical rule, however, the PSC assumed that a complaint may not be amended *following* an order of dismissal for lack of standing. Yet, the PSC cited no authority in its own procedural rules for this assumption, and extant caselaw contradicts the PSC's assumption. "Dismissal without leave to amend is improper unless it is clear . . . that the complaint could not be saved by any amendment." *Maya v. Centex Corp.*, 658 F.3d 1060, 1072 (9th Cir. 2011) (internal quotation marks omitted). In *Maya*, the district court determined that the plaintiffs had failed to establish one of the elements of standing (causation) in their pleadings. The plaintiffs sought to amend in order to introduce expert testimony that could cure this deficiency, but the district court denied the request. On appeal, the Ninth Circuit agreed that the plaintiffs had failed to establish causation, but the court reversed the denial of their motion to amend. "[W]e cannot say that it is clear that the complaint could not be saved by any amendment"; accordingly, "plaintiffs should be permitted to amend their complaint and attach expert testimony on causation." *Maya*, 658 F.3d at 1073.

¶53    Contrary to the PSC's assumption, therefore, there is not a categorical bar to a party's amending her complaint, after an order of dismissal, in order to cure a deficiency in her pleadings on the issue of standing. The PSC has discretion under its rules to allow amendments to pleadings and complaints. Admin. R. M. 38.2.1207, 38.2.2105. The PSC failed to exercise that discretion in this case based on the mistaken view that a complaint cannot be amended after a dismissal order. "[A]n agency, vested with discretion, abuses that discretion when it behaves as if it has no other choice than the one it has taken . . . ." *Clark Fork Coalition v. Mont. Dept. of Envtl. Quality*, 2008 MT 407, ¶ 43, 347 Mont.

197, 197 P.3d 482 (internal quotation marks omitted); *see also e.g. Whitehall Wind, LLC v. Mont. Pub. Serv. Commn.*, 2010 MT 2, ¶ 24, 355 Mont. 15, 223 P.3d 907 ("The PSC's argument ignores the rules it has implemented and is empowered to enforce. An administrative agency must comply with its own administrative rules."). Accordingly, it is necessary to reverse and remand this case to the PSC so that it may exercise its discretion, in the first instance, as to whether the amended complaint should be allowed.

¶54   In sum, the Grubas' and the Barsantis' allegations are sufficient to meet the statutory "directly affected" standard. There is not a categorical procedural bar to the filing of an amended complaint following an order of dismissal for lack of standing. The PSC has discretion to allow the amended complaint in this case, to require that the Grubas' and the Barsantis' allegations be re-filed as a new complaint, or to take some other course of action within the PSC's discretion.

## CONCLUSION

¶55   Williamson, the Klingmans, and Doty lack standing under § 69-3-321(1), MCA, and this action was properly dismissed as to these four complainants. The Grubas' and the Barsantis' allegations satisfy the "directly affected" standard of § 69-3-321(1), MCA. This action is remanded to the District Court with instructions to remand to the PSC so that the PSC may exercise its discretion, in the first instance, as to whether to allow the amended complaint.

¶56   Affirmed in part, reversed in part, and remanded for further proceedings consistent with this Opinion.

/S/ JAMES C. NELSON

We Concur:


/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ MICHAEL E WHEAT
/S/ JIM RICE